## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ELSIE TOM, as personal representative
of the Estate of Sam Tom,

   Plaintiff,

v.              CV 10-1257 LH/WPL

S.B., Inc., et al.,

   Defendants.

## MEMORANDUM OPINION AND ORDER

Few cases in civil court manage to raise eyebrows like this one has. Before me today is Plaintiff Elsie Tom's request that I enter default judgment against Defendants Sherman Brothers, Inc. ("SB"), Sam Ruff, and Protective Insurance Company for their egregious conduct during discovery. (Doc. 46.) Tom brings serious allegations of foul play against the Defendants. They are so serious that, after an initial review of the facts, I ordered defense counsel Phillip W. Cheves to show cause why I should not impose Rule 11 sanctions for his participation in the litany of abuses. (Doc. 65.)

 Cheves filed an *ex parte* response to my order, which contained a great deal of attorney-client privileged material. (Doc. 72.) Much of the privileged material supplied a factual basis supporting sanctions against both Cheves and SB. While it is acceptable for Cheves to disclose attorney-client privileged material in order to protect himself from sanctions, *see* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS §§ 64, 83 (2000), it would be inappropriate for me to include the privileged material in a publicly accessible order. Thus, I have decided to file two Memorandum

Opinion and Orders ("MOOs"). This MOO has been redacted[1] and is accessible by Tom, her counsel, and the public. A second MOO, filed concurrently with this one, has been filed *ex parte* and it contains a detailed, factual basis for my opinion. This approach will satisfy the need to preserve privilege and the need to root my decision in the facts.

After having carefully reviewed the facts and the law, I deny Tom's motion for default judgment and I grant her motion to extend discovery. Additionally I order sanctions against SB, Ruff, and Cheves for discovery violations. Since this motion does not result in dispositive action, I have the authority to resolve this matter. *See Hutchinson v. Pfeil*, 105 F.3d 562, 565 (10th Cir. 1997) ("a request for a sanction . . . is among the nondispositive matters which a magistrate judge may decide"); *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519-20 (10th Cir. 1995) ("Even though a movant requests a sanction that would be dispositive, if the magistrate judge does not impose a dispositive sanction the order falls under Rule 72(a) rather than Rule 72(b)."). Accordingly, I am not filing a Proposed Findings and Recommended Disposition, even though Judge Hansen has entered a order of reference; instead, I am entering an order which fully resolves this matter.

## FACTUAL & PROCEDURAL BACKGROUND

On March 6, 2010, Sam Tom died in a car accident outside of Gallup, New Mexico after his car was hit by a commercial truck owned by SB and driven by Ruff. (Doc. 1 Ex. B at 3.) [ . . . ][2]

In October 2010, the decedent's wife, Elsie Tom, brought a wrongful death action in state

---

[1] The symbol [ . . .] indicates that privileged materials have been redacted from this MOO. While this may render some of my statements and findings conclusory, the ex parte MOO contains the appropriate support.

[2] [ . . . ]

court against the Defendants[3] alleging that Ruff was negligent and that SB failed to properly maintain its trucks and supervise Ruff. (Doc. 1 Ex. B at 3-6; Doc. 47 at 1.) Defendants removed the case to federal court on December 30, 2010. (Doc. 1.)

In April 2011, the parties commenced discovery. Initially, discovery was uneventful and required little involvement by the Court. (*See* Doc. 24; Doc. 25.) In October 2011, that changed. It began, of course, with a motion. On October 5, 2011, Defendants filed a motion to quash and for a protective order. (Doc. 30.) Tom had sent a notice of deposition and subpoena for records to SB's consulting expert, Evans and Associates, Inc. (Doc. 30 at 1-2.) Specifically, Tom requested information and records relating to the collision, including repairs done or data collected from the truck and trailer. (*Id.* at 2.) Defendants sought to quash the subpoena on the grounds that Evans and Associates was a consulting expert, and a party may not use interrogatories or a deposition to discover facts or opinions held by a consulting expert. (Doc. 30 at 2.)

That same day, Tom responded to the motion, arguing that she was not seeking information from an undisclosed expert; rather, she sought electronic data and post accident inspection records, which had been collected shortly after the collision and that were not available any other way. (Doc. 31 at 2.) Tom concurrently filed a motion to compel, asking the Court to order Defendants to produce records of all repairs to the truck a month before and after the collision. (Doc. 32.) Tom had

---

[3] SB's insurer, Protective Insurance Company, is a named defendant in this action, but Baldwin and Lyons is not. (Doc. 1.) There is also a fourth defendant, Great West Casualty Co., which never entered an appearance in the case. The Complaint names both Protective and Great West because they allegedly provided motor vehicle liability insurance coverage to SB at the time of the accident. (Doc. 1 Ex. B at 2.) Even though Great West has not entered the case, the company has been erroneously included in the Docket Report as being party to a Certificate of Service for initial disclosures, the Joint Status Report, and the Response to Tom's Motion to Extend Discovery. (Doc. 12; Doc. 13; Doc. 62.) However, it is not clear whether Great West was even served. Since Great West has not entered the case and none of the pleadings before me make any reference to Protective, when I refer to "Defendants," I am only referring to SB and Ruff.

sought this information in a request for production, but Defendants had responded only with records dated prior to the date of the crash, providing no repair records after that date. (*Id.* at 2-3.) The truck had been in the possession of Defendants at all times after the crash, and, as Tom pointed out, "[t]he records of repairs done are vital to a determination of the condition of the brakes and other equipment on the truck." (*Id.* at 3.)

I held a telephonic hearing on October 17, 2011, to discuss the motions. (Doc. 37; Doc. 69.) Paul Barber and Forrest Buffington, counsel for Plaintiff, and Cheves were present at the hearing. (Doc. 37 at 1; Doc. 69 at 2.) I first heard arguments on Tom's Motion to Compel. (Doc. 37 at 1; Doc. 69 at 3-10.) Barber explained that, according to a report by a New Mexico Department of Transportation Officer, the tractor was taken to Oregon for repairs after the accident, and any records of the repairs must be maintained by federal law. (Doc. 69 at 4-5.) The trailer was ruled out of service and impounded until it could be repaired. (*Id.* at 4.) Since the trailer was later picked up, Barber argued it had to have been repaired. (*Id.*) Barber argued that repair records must exist, and he had tried for months to obtain them from Cheves to no avail. (*Id.* at 5.)

In rebuttal, Cheves asserted that Defendants had produced everything they possessed regarding the repairs on the truck and trailer, and that the truck had never been taken to Oregon. (Doc. 37 at 1; Doc. 69 at 6.) The Court asked Cheves if he had contacted Ruff, the driver, regarding any of the repairs or towing. (Doc. 37 at 2; Doc. 69 at 7.) Cheves responded that he had, but explained, "The issue with Mr. Ruff . . . is – because he's a truck driver, I have not been able to follow up with him regarding . . . whether or not there's been repairs. Again, your Honor, as far as what we have, we have produced it." (Doc. 69 at 7.)[4]

---

[4] Later in the hearing, I commented that I knew Ruff was a truck driver, implying that I understood he was difficult to contact. (Doc. 69 at 9.) I was not corrected.

4

I denied Tom's motion to compel, reasoning that "I cannot compel the defense to produce documents they do not possess." (Doc. 38 at 2.) I clarified that if Defendants located the records after the depositions and Tom needed additional depositions as a result, then Defendants would be obliged to cover Tom's costs. (*See* Doc. 37 at 2; Doc. 69 at 9.)

Turning to Defendants' motion to quash, I granted the motion because I did not believe Tom had shown exceptional circumstances that would warrant subpoenaing records from a consulting expert. (Doc. 38 at 1; Doc. 69 at 10.) During oral argument, Tom suggested that Defendants had provided information to the consultants that had neither been identified nor produced to Tom. (Doc. 69 at 7.) After ruling, I stated,

> [I]f Mr. Cheves has done what you intimated he may have done, which is to send records to Evans and Associates and not send them to you . . . that would be pretty dramatic and that's not something we'd address in a telephone conference . . . that would be something we'd be talking about in person because I'd be referring . . . people for professional discipline.

(Doc. 69 at 11.)[5]

The day after the hearing, SB supplemented its responses to an interrogatory and request for production which related to the availability of satellite tracking data on the truck. (Doc. 39.) SB indicated that Ruff's truck may have had some sort of satellite tracking device at the time of the crash, but that they did not have records of his travel on the days leading up to the crash. (Doc. 60 Ex. A.)

During the depositions of October 19 and 20, Defendants' charades began to unravel. On

---

[5] That was not the only time I warned that if Tom's accusations were true I would have to take serious action. Earlier, I had commented, "Mr. Barber, I know you say you suspect they may have sent records to Evans and Associates. . . . [I]f, indeed, Mr. Cheves had done that and he's just lied to me, of course that would be a very dramatic thing and there would be dramatic sanctions." (Doc. 69 at 7.)

October 19, 2011, Paul Barber deposed Ruff. (Doc. 47 Ex. 7A; Doc. 47 Ex. 7B.) Cheves was present at the deposition. (Doc. 47 Ex. 7A at 1.) Ruff testified that he had been terminated in March or April 2010, and since then he had retired and was home every day. (*Id.* at 2.) He also testified that he had never been cited for log book violations or driving with defective equipment. (*Id.* at 4.) Barber then asked Ruff a number of questions about his driving on the day of the accident. Ruff testified that his driver log, which contains information about his driving and break schedule, was accurate and correct. (Doc. 47 Ex. 9B at 1.) He confirmed each entry from his departure from Boardman, Oregon on March 5, 2010 at 7:45 a.m. P.S.T., to the crash site on March 6, 2010 at 6:53 p.m. M.S.T. (Doc. 47 Ex. B at 2.)

On October 20, 2011, Barber deposed Jason Muggy, Vice President of Operations for SB (Doc. 47 Ex. 5A; Doc. 47 Ex. 5B), and Gene Hullette, Fleet and Safety Training Manager for SB (Doc. 47 Ex. 9A; Doc. 47 Ex. 9B). Muggy explained many of the policies and practices of SB. He testified that the company keeps records of all maintenance and repairs on trucks, and that the computer records are relatively easy to retrieve and print. (Doc. 47 Ex. 5A at 4-5.) Muggy clarified that these records are kept not just for business purposes but because they are required by law. (*Id.* at 5.) He also testified that after the accident in question, SB's insurance provider conducted an investigation and the company had received copies of the report. (*Id.* at 3.) He stated that at the time the insurance company did its report, SB did not expect to get sued. (Doc. 47 Ex. 5B at 2.)

Muggy also discussed Ruff's termination and disciplinary history. He explained that the company uses a computer program to track its trucks via satellite and electronically log all trips. (Doc. 47 Ex. 5A at 2.) The company also uses something called "Comdata" which records when and where fuel purchases take place. (*Id.*) Muggy testified that the company felt that there were inconsistencies in Ruff's logs, as compared to the tracking data and Comdata, and that they "didn't

feel he accurately reflected his trips" in his driver logs. (Doc. 47 Ex. 5B at 1.) These inconsistencies were part of the reason for Ruff's termination. (*Id.* at 3.)

Hullette's deposition proved equally revealing. Hullette confirmed that the company felt there were inconsistencies between Ruff's logs and the dispatch records. (Doc. 47 Ex. 9B at 2.) In fact, he stated that he had personally seen satellite tracking data for the trip leading up to the crash, and that the data "confirmed [his] suspicions of the inconsistences against [Ruff's] written log." (*Id.*) Hullette also explained that Ruff was terminated for "his whole file," which included his hours of service violations. (Doc. 47 Ex. 9B at 1.) He stated that Ruff had received "one or two" written warnings for his violations in the past. (Doc. 47 Ex. 9A at 3.)

More than a week after the depositions, Defendants served a supplemental response to a request for production that had asked for all reports and inspection records for the truck and trailer. (Doc. 41; Doc. 60. Ex. B.) The supplemental response contained a Trailer Inspection Worksheet from May 3, 2010, and three Repair Order Detail Reports from May 3, May 17, and June 24, 2010. (Doc. 60 Ex. B at 2.)

On December 1, 2011, Tom filed the motion at issue, requesting a default judgment. (Doc. 46.) Prior to filing a response to the motion, Defendants served supplemental responses to four requests for production (Doc. 60 Ex. C; Doc. 61) and supplemental answers to five interrogatories (Doc. 60 Ex. D; Doc. 61). Defendants filed their response to the motion for default on December 29, 2011 (Doc. 60), and Tom filed a reply on January 13, 2012 (Doc. 66).

In addition to this motion for default judgment, Tom moved to extend discovery in light of the new information that has come out since the October 2011 depositions and subsequent disclosures by Defendants. (Doc. 58.) Tom has requested an additional ninety days for discovery, permission to conduct an additional ten depositions, and leave to serve each defendant with thirty

7

additional interrogatories and requests for production. (*Id*. at 1.)

While the matter before me involves discovery, it also asks the Court to take dispositive action. Accordingly, Judge Leroy Hansen entered an order of reference requesting that I conduct legal analysis, make findings of fact, and recommend an ultimate disposition in the matter. (Doc. 48.) After an initial review of the motion and the response, I became deeply concerned by the seeming involvement of Cheves in many of the allegations made by Tom. This concern was exacerbated by the utter absence of any meaningful explanation by Defendants of their conduct in their response brief. Accordingly, I issued an order to show cause as to why the Court should not sanction Cheves under Rule 11. (Doc. 65.) Cheves responded on January 26, 2011. (Doc. 72.) Since the document was filed *ex parte*, it was not available for Tom's review. Tom filed a reply, nonetheless, stating that she believed Defendants, and not counsel, were at fault. (Doc. 76.) I vacated all pretrial deadlines and suspended the litigation while this matter was being addressed. (Doc. 73.)

Since December, Defendants have continued to supplement their answers to various interrogatories and requests for production. (Doc. 63; Doc. 64; Doc. 67; Doc. 68; Doc. 75.)

### LEGAL STANDARDS

The Federal Rules of Civil Procedure, anticipating that civil litigation would not always be entirely civil, provide a means for a district court to sanction attorneys and their clients for a variety of inappropriate conduct. *See* FED. R. CIV. P. 11, 26(g)(3), 37. Additionally, courts have an inherent power to sanction attorneys and parties. *Chambers v. NASCO, Inc*., 501 U.S. 32, 49 (1991). It is through these tools that courts may preserve the dignity of the legal process.

### I.    Default Judgment under Rule 37

Rule 37 governs the use of sanctions against parties for discovery abuses. The rule permits a court to enter a default judgment against a party who provides evasive or incomplete disclosures,

answers, or responses or fails to supplement an earlier response as required by Rule 26. FED. R. CIV. P. 37(a)(4) & (c). Because of the severity of a default judgment, "due process requires that 'failure' is a sufficient ground only when it is the result of 'willfulness, bad faith or [some] fault of [the party],' rather than inability to comply." *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 872 (10th Cir. 1987) (citing *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 640 (1976)). Willful failure is defined as "any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown." *In re Standard Metals Corp.*, 817 F.2d 625, 628-29 (10th Cir. 1987) (quotations omitted).

In ascertaining whether a litigant's actions rise to the level of "willfulness" necessary to substantiate dispositive action, the Tenth Circuit applies a five part test. *Ehrenhaus v. Reynolds*, 965 F.2d 916 (10th Cir. 1992). Although the *Ehrenhaus* test was born from a decision to dismiss a case, it is equally applicable to motions for default judgment. *See generally Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1323 (10th Cir. 2011) (discussing the application of *Ehrenhaus* in cases of dismissal and default judgment). Under *Ehrenhaus*, a court should evaluate: (1) the degree of actual prejudice to the litigant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance; and (5) the efficacy of lesser sanctions. 965 F.2d at 920-21. In applying the five factors, the Court should review each alleged event separately and then as a whole. *Toma v. City of Weatherford*, 846 F.2d 58, 60 (10th Cir. 1988). The factors should also be considered as guide posts, as not all of the factors must be satisfied in order to enter default judgment. *Lee*, 638 F.3d at 1323 (citing *Archibeque v. Atchison, T. & S.F. Ry.*, 70 F.3d 1172, 1174-75 (10th Cir. 1995)).

Despite the severity of a dispositive sanction, this circuit has affirmed the use of default

judgments and dismissals for discovery violations frequently in the past year. *See Stitching*

*Mayflower Mt. Fonds v. City of Park City*, 441 F. App'x 568, 570 (10th Cir. 2011) (unpublished)

("This case represents at least the sixth time this year that this court has had to affirm dismissals or

default judgments resulting from repetitive abuses of the discovery process . . . It is a sad record.").

It is noteworthy that all of the Tenth Circuit cases regarding dispositive sanctions in 2011 were

brought under Rule 37(b), which pertains to the refusal of a party to comply with court orders. *See*

*generally Lee*, 638 F.3d 1318 (10th Cir. 2011) (affirming dismissal of case after plaintiff violated

two orders and made a false certification); *Stitching*, 441 F. App'x at 569-70 (affirming dismissal

where plaintiff violated at least five discovery orders over the course of four years); *Gross v. GM*

*LLC*, 441 F. App'x 562 (10th Cir. 2011) (unpublished) (affirming dismissal where plaintiff

instructed doctor not to produce records despite a court order); *Norouzian v. Univ. of Kan. Hosp.*

*Auth.*, 438 F. App'x 677 (10th Cir. 2011) (unpublished) (affirming dismissal where plaintiff

repeatedly refused to appear for a deposition after numerous court orders and did not attend a

hearing); *Freddie v. Marten Transp., Ltd.*, 428 F. App'x 801 (10th Cir. 2011) (unpublished)

(affirming dismissal of case where plaintiff failed to produce documents after ordered to do so and

lied to the court); *Chicago Ins. Co. v. Hamilton*, 422 F. App'x 740 (10th Cir. 2010) (unpublished)

(affirming default judgment where *pro se* defendant failed to file an answer despite numerous

hearings and reminders by the court).

While there is an alarming amount of case law regarding default judgment and dismissal

under Rule 37(b), there are few cases regarding dispositive sanctions for violations of Rule 37(c),

which is the provision at issue in this case. In fact, this circuit often finds that the failure to comply

with general discovery rules, even if frustrating, rarely reaches the level of willfulness or bad faith

required for such a harsh sanction. *See generally Toma*, 846 F.2d at 59-62 (holding Plaintiff's failure

to respond to requests for production, timely answer interrogatories, attend a deposition, and timely

respond to motion for sanctions is grounds for sanctions but not dismissal); *Patterson v. C.I.T.*

*Corp.*, 352 F.2d 333 (10th Cir. 1985) (holding party's failure to appear at a deposition does not

warrant default judgment and prior dilatory conduct may not be used to infer bad faith); *Wilver v.*

*Fisher*, 387 F.2d 66 (10th Cir. 1967) (reversing decision to enter default judgment when defendant

failed to respond to interrogatories).

The difference in the outcomes of the Rule 37(b) cases versus other Rule 37 sanctions cases

highlights an important distinction between how this circuit evaluates outright "disobedience" and

general "misbehavior." *Cf. In re Reed*, 11 B.R. 258, 273 (Bankr. D. Utah 1981) (describing

violations under Rule 37(b) as "disobedience" and under 37(d) as "misbeahvior"). Rule 37(b)

sanctions a party's "disobedience," that is, it punishes a party for his failure to follow specific

instructions from the court as to how he must act. Rule 37(c), though, punishes "misbehavior,"

which is breaking general rules which apply equally to all. The fact that there is far more case law

granting the harshest of sanctions for disobedience than misbehavior indicates that the act of direct

defiance seems to warrant greater punishment. Likely this stems from some latent concept of notice.

A court order puts an attorney and his client directly on notice of the specific behavior that is

demanded of them. Rules of procedure, on the other hand, provide constructive notice of what is

expected, but they do not create the same sense of personal obligation. Furthermore, while attorneys

should be well versed in the Federal Rules, parties do not have the same fluency in court etiquette.

The fact still remains that default judgments are permissible for mere "misbehavior." *See*

Fed. R. Civ. P. 37(c)(1)(C) & (d)(3). Dispositive sanctions under these "misbehavior" provisions

have been reserved by the courts as "a last resort." *United States v. Certain Real Prop. Located at*

*Route 1*, 126 F.3d 1314, 1317 (11th Cir. 1997) (discussing the use of Rule 37(d) sanctions). Thus,

this leads me to reason that "misbehavior" warranting a default judgment must be so egregious, in such bad faith, that it is clear to all involved that such behavior could never be tolerated in a court of law. In fact, these principles seem to be echoed in the *Ehrenhaus* factors which address whether a party was warned of sanctions and the amount of interference with the judicial process. 965 F.2d at 920-21. Thus, in such a situation, it would be as if the factor of judicial interference completely overshadows the absence of a warning. Anything less cannot substantiate default, although it may still warrant severe sanctions.

Should a court decide that the misbehavior does not warrant default judgment, but does demand sanctions under Rule 37(c), "a district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). The court should still weight the following factors in determining the appropriate sanction: (1) the prejudice or surprise to the party; (2) the ability of the party to cure the prejudice; and (3) the moving party's bad faith. *Id.* (citations omitted). A court has broad discretion in fashioning the appropriate sanction under Rule 37(c), and this includes awarding costs and fees and informing the jury of the party's failure to properly disclose information. Fed. R. Civ. P. 37(c)(1).

## II.    Sanctions on Attorneys under Rules 37, 26, and 11

In reviewing whether sanctions are appropriate, the court should consider *who* acted in bad faith, the party or the attorney, and to what degree. After all, "if the fault lies with the attorney, that is where the impact of the sanction should be lodged." *M.E.N. Co.,* 834 F.2d at 873 (quoting *In re Baker*, 744 F.2d 1438, 1442 (10th Cir. 1984)). While this circuit has made it abundantly clear that a district court should be careful to apportion sanctions according to the degree of culpability, it is not clear from where the court derives its sanctioning power. The Second, Third, and Seventh

Circuit have all stated that a court may not sanction an attorney under Rule 37(c). *See Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 141 (3d Cir. 2009); *Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003); *Apex Oil Co. v. Belcher Co. of N.Y.*, 855 F.2d 1009, 1014 (2d Cir. 1988). These circuits rely on the language of Rule 37(c), which only discusses "the party" and not "the attorney." *See Grider*, 580 F.3d at 141; *Maynard*, 332 F.3d at 470; *Apex*, 855 F.2d at 1014. *Compare* Fed. R. Civ. P. 37(a)(5)(A), *and* 37(a)(5)(B), *with* 37(c)(1).

The Tenth Circuit has not expressly addressed this issue, but it has upheld, and never questioned, the validity of the imposition of monetary sanctions on attorneys under Rule 37(b). *See Law v. NCAA,* 134 F.3d 1438, 1441 (10th Cir. 1998); *Myers v. Colgate-Palmolive Co.*, 26 F. App'x 855, 862 (10th Cir. 2002) (unpublished). Rule 37(b), like Rule 37(c), does not use the word "attorney" among those the court may sanction. *See* Fed R. Civ. P. 37(b)(2). Thus, I believe that I may sanction an attorney under Rule 37(c), so long as it is limited to the imposition of a monetary sanction. However, out of an abundance of caution, I also look to other sources that govern attorney sanctions.

Under Rule 26, a party or attorney must certify that every discovery request or response is, to the best of the person's knowledge or belief, "complete and correct as of the time it is made." Fed. R. Civ. P. 26(g)(1)(A). Improperly certifying a discovery request warrants an "appropriate sanction," which may include awarding attorney's fees. Fed. R. Civ. P. 26(g)(3). By its terms, though, this sanction is limited to the improper certification of documents.

The court may also impose sanctions *sua sponte* against an attorney for making false representations to the court. Fed. R. Civ. P. 11(c). The court must notify the attorney of the conduct at issue and provide the attorney with an opportunity to be heard and to respond to the allegations. *White v. GM Corp.*, 908 F.2d 675, 686 (10th Cir. 1990). If the court chooses to sanction an attorney

13

under Rule 11, then the sanction "must be limited to what suffices to deter repetition of the conduct." FED. R. CIV. P. 11(c)(4). The court may impose non-monetary directives or order the attorney to pay a penalty to the court or the reasonable attorney's fees related to the penalized conduct. *Id.* The obligations imposed by Rule 11 are ongoing and "are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *See* FED. R. CIV. P. 11, advisory committee's note (1993). Rule 11 cannot apply "to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37." FED. R. CIV. P. 11(d). This provision is logical, as it prevents the court from imposing sanctions under Rule 37(c) and Rule 11 for the same offense. However, if sanctions under Rule 37(c) or 26(g) do not apply, by its terms, Rule 11 will.

Lastly, a court has the inherent authority to sanction bad-faith conduct in litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-67 (1980); *Braley v. Campbell*, 832 F.2d 1504, 1510 (10th Cir. 1987) ("To deter frivolous and abusive litigation and promote justice and judicial efficiency, the federal courts are empowered to impose monetary sanctions, by statutes and the rules of civil and appellate procedure as well as their inherent right to manage their own proceedings.") This authority is ever present, and a court may sanction bad faith conduct through its inherent authority, even when that conduct could also be sanctioned by the Federal Rules of Civil Procedure or a statute. *Chambers*, 501 U.S. at 50.

## DISCUSSION

Tom claims that Defendants have routinely withheld information, lied to Tom, and lied to this Court, and that such offenses warrant a default judgment in Tom's favor. I have categorized Tom's allegations into six separate incidents which support her motion for default judgment. While

14

some of these incidents are not grounds for sanctions under Rule 37(c), I will consider them here in order to gauge the pervasiveness of the alleged deception. After a review of each incident on its own, I will consider the totality of the violations, and determine which sanctions are appropriate, if any. Tom did not move for attorney sanctions under Rule 11 or 37, but she stated that Cheves "was dishonest with the Court." (Doc. 47 at 22.) Acting *sua sponte*, I ordered Cheves to respond to Tom's allegations, and I will consider Cheves' response and the other pleadings to determine first, whether Cheves has played any part in these alleged abuses, and second, if this Court should sanction Cheves under Rule 37(c), 26(g), or even 11(c).

I.   **Alleged Incidents of Dishonesty**

   A.   *Maintenance and Repair Records*

Tom's first request for production to SB included a request for all inspection reports and records of repairs for the trailer and truck involved in the accident. (Doc. 47 at 2-6; Doc. 47 Ex. 1). SB's initial response did not include any records of repairs or maintenance performed after the accident. (Doc. 47 Ex. 2.) Tom attempted to obtain the post-crash records from Cheves throughout the summer of 2011 by informal discussions and formal motion (Doc. 32 Ex. C at 1; Doc. 38), but Cheves adamantly insisted the defendants had no such records.

Muggy's deposition, taken three days after the motion hearing, revealed that it was simple to search for and retrieve maintenance records. (Doc. 47 at 4-5; Doc 47 Ex. 5a at 4-5). Miraculously, days after the deposition, SB produced the post-crash repair and maintenance records for the truck that they had allegedly been unable to locate up to that point. (Doc. 47 at 5; Doc. 60 Ex. B).

Defendants' response brief offers no insight into why these documents were not produced when first requested. In fact, after proffering a general denial of wrongdoing, they state that "at the time the original discovery responses were made, the responses that defendants did not have

15

documents to produce was [sic] correct and truthful." (Doc. 60 at 7.) Defendants insist that they were in full compliance with the rules because they allegedly produced all of the requested discovery as soon as they found them. (*Id.*)

Cheves' response to this incident is confusing. The language of his response reads as if there were some sort of misunderstanding about the records that Tom had requested. (Doc. 72 at 7.) It is unclear why Cheves is making this point because the post-crash maintenance records are all that are currently at issue. This is precisely the problem. Tom requested the post-crash records, again and again. Cheves admits that he understood perfectly what Tom wanted. Nowhere does he provide an explanation as to why records that were easy to find were not found.

Ultimately, when Cheves signed the response to the initial requests for production, he certified to Tom and to the Court that, to the best of his knowledge, information, and belief formed after a reasonable inquiry, the disclosure was complete and correct. *See* Fed R. Civ. P. 26 (g)(1). He told me on the record that he had attempted to locate the documents and that they did not exist. He even affirmed in his response that he "diligently undertook to obtain the maintenance and repair records . . . ." (Doc. 72 at 8.)

Despite his vehement declarations of diligence, a question posited by opposing counsel during a deposition revealed that SB's Vice President of Operations knew exactly how to locate the requested information, affirming that this type of record keeping is mandatory and the retrieval of documents is relatively simple. I am left, then, to consider that this oversight was the result of one of two scenarios: (1) Cheves made a poor attempt to locate the requested information and lied to the Court as to his diligence; or (2) SB, Cheves, or both intentionally withheld the documents and lied to the Court as to their existence.

While both scenarios involve a sanctionable offense, the latter presents a grave accusation.

I cannot overlook it, though, since SB did produce the pre-crash maintenance and repair records. How is it that the pre-crash records were available and not the post crash records, despite the fact that the records would all logically be contained in the same file and be accessible through the same search methods? Cheves has been involved in the case from its inception and oversaw the investigation. He should have known if any post-crash maintenance or repairs were performed on the tractor or truck.

Cheves places the responsibility for withholding the documents entirely on SB, but I find that he was just as culpable. The basis for my disbelief in his efforts stems from his statements during the October 11 hearing. During the hearing, recognizing the importance of any post-crash records, I asked Cheves if he could contact Ruff to ask if he knew about any existing records. Cheves responded that he had not been able to follow up with Ruff since he is a truck driver, implying that his constant travels make him difficult to pin down. (Doc. 69 at 7.) However, Ruff's testimony reveals that he is retired, he has been retired since the beginning of this litigation, and he is at home every day.

I cannot imagine a situation which could possibly justify Cheves' ignorance as to this point. This is likely why neither Defendants' response brief nor Cheves' response to the order to show cause attempts to explain this statement. Cheves blatantly misrepresented his ability to contact Ruff as a means to secure the requested documents, which makes his innocence in this matter all the less plausible. Absent any mitigating circumstances or explanation, which were not offered to this Court, I can infer from the facts only one conclusion – Cheves lied.

It is clear that this is a sanctionable event. Defendants provided an evasive and incomplete answer to Tom's request for production. *See* FED. R. CIV. P. 37(a)(4) & (c). Cheves' lie carries significant weight in my evaluation of the gravity of this discovery violation. I find that both SB and

17

Cheves willfully acted to conceal these documents from Tom. However delayed, though, the actual repair records have come to light, and Tom has been served with a copy of the relevant records from after the crash. Thus, in determining the appropriate sanction I must balance the willful and truly bad-faith conduct of SB and the intentional misrepresentations to the Court by Cheves with the fact that the only prejudice to Tom is the delay in her ability to conduct discovery. This delay is coupled with the inevitable cost of now having to repeat her efforts to discover answers which could have easily been supplied at the beginning of this litigation. Furthermore, I note that Ruff was not involved in SB's and Cheves' deception to the Court.

       *B.*    *Defendants' Investigations into the Accident*

      Tom's Interrogatories Nos. 3 and 4 asked for information about communications, statements, or investigations made by Defendants or their insurers regarding the accident. (Doc. 47 at 6.) Defendants objected to the interrogatories on the grounds that they asked for information prepared in anticipation of litigation and that the information requested was privileged. (Doc. 47 Ex. 8 at 2-3.) All that SB provided was a copy of the McKinley Country Sheriff's Department Accident Report and the Accident/Injury Analysis. (*Id.*) SB did not produce a privilege log in conjunction with its initial response, effectively waiving the objection. *See* FED. R. CIV. P. 26(b)(5); *Carrel v. Davis*, No. 10-4124-RDR, 2011 U.S. Dist. LEXIS 85012, at *7 (D. Kan. Aug. 1, 2011).

      Again, during the October depositions, facts came to light which brought Defendants' answers into question. Muggy testified that SB's insurance company conducted an accident investigation, that SB received a copy of the resulting report, and at the time of the investigation the company did not expect to be sued. (Doc. 47 at 7-8; Doc. 47 Ex 5A at 3; Doc. 47 Ex. 5B at 2.)

[ . . . ]

      On December 23, 2011, Defendants supplemented their answer to Interrogatory No. 4 to

read, "An investigation was conducted by Crawford & Co. at the direction of Baldwin & Lyons and under the supervision of counsel. Verbal statements were taken from Phillip Henio and Gerald Pelt." (Doc. 60 Ex. D at 2; Doc. 61.)

[ . . . ]

It is clear that documents prepared in anticipation of litigation are ordinarily not discoverable. FED. R. CIV. P. 26(b)(3)(A). To qualify for this exception, the anticipated litigation need not be imminent, but it must be possible. *Murphy v. Gorman*, *271 F.R.D.* 296, 311 (D.N.M. 2010)*; Anaya v. CBS Broad., Inc.*, 251 F.R.D. 645, 651 (D.N.M. 2007). However, that possibility must be more than remote. *Anaya*, 251 F.R.D. at 651 (quoting *Fox v. Cal. Sierra Fin. Servs.*, 120 F.R.D. 520, 524 (N.D. Cal. 1988)).

Given that [ . . . ] SB [ . . . ] did not believe that there would be a lawsuit at the time of the investigation, I cannot accept that Cheves mistakenly thought the documents were protected. [ . . . ] Furthermore, Cheves produced a privilege log in his response to Request For Production No. 10 (Doc. 47. Ex. 1 at 7), which proves he was aware he had to provide a privilege log if he was withholding documents under a claim of privilege. Yet, he produced no privilege log in his initial response to this request. The absence of a log reinforces my belief that he was intentionally concealing documents. For Cheves to call his actions an honest mistake is patently dishonest. I find that Cheves knew why the documents were prepared, he knew that they were not privileged, but he intentionally withheld them. His response to my order to show cause only reaffirms his lies to the Court.

With respect to the severity of this violation, I must again consider the intentional and egregious conduct of SB, the continual dishonesty of Cheves, which persists even now, and the fact that Tom now has access to these reports. Once again, Ruff cannot be held accountable in any way

19

for this violation and should not be punished for it.

### C.    *Disciplinary Actions Against Ruff*

Tom claims that SB lied in its responses to an interrogatory and a request for production regarding Ruff's disciplinary history. (Doc. 47 at 9, 11.) Tom asked if the company had taken any disciplinary action against Ruff for the accident, and she requested Ruff's employment files, including any disciplinary records. (*Id.*) SB denied having any information as to whether Ruff was disciplined (*id.*; Doc. 47 Ex. 8 at 6), and when SB produced Ruff's employment file it did not contain any disciplinary or termination records (Doc. 47 Ex. 1 at 4-5).[6] Both Cheves and Mark Philips, the Safety and Training Coordinator for SB, signed the answers to the first set of interrogatories, and Cheves signed the responses to the requests for production.

The depositions revealed that Ruff was terminated after the accident, albeit for his entire record, and that Ruff had received written employee warnings prior to the accident. (Doc. 47 Ex. 5B at 3-4; Doc. 47 Ex. 9B at 1-2.) SB maintains that Ruff was not fired only for the accident, but admits that the accident was a factor. (Doc. 47 Ex. 9B at 1.) Additionally, Muggy testified that Ruff was on a "last chance" agreement at the time of the crash, so there must have been a history of violations. (Doc. 47 Ex. 5B at 1.)

As expected, after the depositions, Defendants supplemented their answers. On December 23, 2011, SB provided Ruff's entire employee file, which included seven employee warnings (Doc. 66 Ex. 2d; Doc 66 Ex. 2e) and Ruff's termination records (Doc. 66 Ex. 2f). According to the records, Ruff was fired on March 22, 2010, for "safety violations." (*Id.* at 5.) Gene Hullette sent an email to two other individuals that day, notifying them that Ruff had been terminated. (*Id.* at 6.) The copy

---

[6] Ruff did disclose that he had been terminated after the accident in his answers to Tom's first set of interrogatories, which were served on Tom on September 29, 2011. (Doc. 47 Ex 10 at 2.)

of the email has a date stamp on the bottom, reading "03/31/2010," which Tom speculates is the date the email was included in Ruff's file. (Doc. 66 at 3.)

[ . . . ]

Not only is the failure to produce the complete file infuriating, but SB also failed to properly respond to the interrogatory about disciplinary action taken against Ruff. Hullette admitted that the accident was a partial reason for Ruff's termination, and certainly termination is the severest form of disciplinary action. Again, it appears as if SB and Cheves acted in bad faith. Luckily for Tom and, to some degree, Defendants, Tom is aware of these records now and can prepare accordingly. She has not been unduly prejudiced, but her time and resources undoubtedly have been wasted.

D.     *Ruff's Prior Citations & Travel Logs*

SB was not the only Defendant to provide an alternative version of the truth. Under oath, Ruff testified in his deposition that he has never been cited for log book violations or driving with defective equipment. (Doc. 47 at 13; Doc. 47 Ex. 7A at 4.) However, in 2008 and 2010, he received citations for these violations from the California Highway Patrol. (Doc. 47 Ex 11; Doc. 47 Ex. 12; Doc. 47 Ex. 13.)

Ruff also testified that he understood that he was required by law to keep proper records, or "log books," of his trips. (Doc. 47 Ex. 7B at 1.) He claimed that while working for SB the only discrepancy they ever found was over "misaddition." (*Id.* ) He also testified that his trip prior to the accident was consistent with his log book entries. (*Id.* at 1-3.) However, Muggy and Hullette both testified that they believed that Ruff's logs were inaccurate. (Doc. 47 Ex. 5B at 1; Doc. 47 Ex. 9B at 1-2.)

Tom explains that based on fuel purchase records it would be highly improbable, if not impossible, for Ruff's log to be accurate. (Doc. 47 at 16.) While there are a number of noted

discrepancies, the most striking is that in order for Ruff to be at the scene of the accident, he would have had to have driven the last 295 miles of the trip at an average rate of seventy-eight miles per hour, without stopping, in a loaded truck on a two lane highway through "vacation country."(Doc. 47 at 17.) James A. Acock, a consultant who specializes in trucking and construction, believes that such a speed is "virtually impossible for a loaded semi on that route." (Doc. 47 Ex. 17 at 1-2.) I agree with him.

Tom clearly caught Ruff in a lie during his deposition. Additionally, Tom correctly notes that SB used Ruff's logs, which contained both locations and times, as a response to an interrogatory requesting the "itinerary of the tractor-trailer on the day giving rise to plaintiff's claim." (Doc. 47 Ex. 8 at 6.) SB's reliance on this data when they knew it to be false is a violation of Rule 37.

Cheves admits to misgivings about Ruff's logs, but claims he "did not realize the gravity of the issue until after the deposition had been taken." (Doc. 72 at 5.) [ . . . ] Even if Cheves did not appreciate the gravity of the issue, the fact that he was aware of an inconsistency means he was bound to investigate it. Tom managed to figure out that Ruff was lying without the assistance of speaking to Ruff, so Cheves should have likewise been capable of making a similar assessment.

### E.    Satellite Tracking Data

Tom makes the accusation that Defendants have hidden or destroyed critical satellite tracking data of Ruff's trip leading up to the accident in New Mexico. (Doc. 47 at 13-15.) One of the issues in the case is whether Ruff violated the federal hours of service and log keeping safety rules. Tom asked in her first set of interrogatories if the truck contained any satellite tracking equipment, and SB replied in July 2011 that "there *may have* been a satellite tracking device on the tractor involved in this accident. However, there are no records to confirm." (Doc. 47 Ex. 8 at 8 (emphasis added).) On October 18, 2011, SB supplemented its answer to the interrogatory, stating "Upon information

22

and belief, the satellite tracking data . . . may have been printed off. Defendant is diligently searching for any of the printed information." (Doc. 60 Ex. A at 2.)

[ . . . ] During the depositions, Hullette testified that he had seen satellite tracking data for the trip and that the data "confirmed [his] suspicions of the inconsistencies against his written log." (Doc. 47 Ex. 9B at 2.) [ . . . ]

The bottom line is that Defendants and Cheves knew, prior to answering the interrogatory, that there had been a satellite tracking system for the truck. However, they did not admit that outright. Rather, they stated there "may" have been a satellite tracking system on the truck, but no records confirmed its existence. This is another false response in discovery. To their credit, they did supplement the answer prior to the depositions.

Tom believes that SB intentionally destroyed the satellite data to prevent it from being discovered. (Doc. 47 at 15.) Based on the general tone of discovery, this allegation is not unfounded. It is convenient that the only copy of the data has disappeared. However, I am not prepared to conclude at this time that SB has affirmatively destroyed evidence. While SB and Cheves withheld a great deal of information, they have now produced all of the other documents requested. This issue is premature and I cannot rule on it until Tom has examined Feder's file, taken his deposition, and filed a motion, if she so chooses.

F.   ECM Unit

To make matters more complicated, there is more than one type of electronic tracking unit on a commercial truck. The truck in question was equipped with an ECM device, which collected information about the speed and distance the truck traveled. (Doc. 47 Ex. 9B at 2; Doc. 66 at 9.) Both Tom and Cheves have clarified that the issues relating to the ECM are separate from the issue of the satellite tracking data. (Doc. 66 at 9; Doc. 72 at 9.)

23

Tom's original interrogatories asked whether there was "any on-board recording device [,] . . . black box or device known by another name that enables communications with the truck or records information concerning the operation of the truck," and, if so, to "describe them in detail, including giving the name and address of the person having custody of any information produced by such devices." (Doc. 66 at 8.) SB's answer read, "Defendant is aware that there may have been a satellite tracking device on the tractor involved in this accident, however there are no records to confirm." (*Id*.) When asked to produce copies of the data from any on-board devices, Defendants claimed not to retain any such data longer than ninety days after collection. (*Id*.)

SB's answer clearly pertains only to the satellite tracking data, not to the ECM unit, even though Tom requested information about both. After filing his motion for default judgment, Tom received supplemental disclosure regarding the ECM unit. (Doc. 66 at 9.) The disclosure contained the report by Feder, the consulting expert hired by Cheves in March 2010 and the expert at issue in the October 17 hearing. (*Id*.) According to the report, Feder had downloaded data from the ECM unit and he "took possession of the module." (*Id*.) [ . . . ]

The first and most obvious issue is that Cheves and SB were fully aware that the unit existed but failed to disclose it to Tom. Cheves makes the remarkable assertion that the ECM unit and data "have been available for Plaintiff's inspection throughout the litigation." (*Id*. at 9.) Unless Tom or her counsel are psychic, they could not inspect something that Cheves was hiding from them. Cheves has no explanation as to why the existence of the ECM unit was not disclosed until December 2011.

 Tom is also concerned that Feder's "unilateral" downloading of the data was potentially destructive and complains that it was done without notice to the opposing party. On this point, I disagree with Tom. Feder downloaded the data months before the commencement of this litigation,

at a time when neither SB nor Cheves anticipated that there would be a lawsuit. I cannot fault them for not predicting that Tom would eventually wish to be part of a joint downloading effort. Additionally, there is no evidence that the act of downloading data destroyed any other data; this is pure speculation at this point.

Lastly, Tom correctly points out that Feder's report, as disclosed, generally summarizes the investigation, "but does not contain any printouts or data that might have been available, with the exception of the data that he wanted to present." The selective production of data is indeed unwelcome, especially given that Tom has had no opportunity to collect her own information from the unit and is entirely reliant on the disclosures from Defendants.

Tom's reply does not accuse Cheves of providing a consulting expert with information not provided to the opposing party. (Doc. 66 at 10.) I do. Federal Rule of Civil Procedure 26(a)(2) makes is crystal clear that a party must disclose all facts or data considered by an expert witness in forming his opinion. I reminded Cheves of this in October, and I unequivocally stated that if he had disclosed information to an expert that he had not given Defendants, that would be grounds for sanctions. Now it is clear that Ron Feder had access to the ECM and its data, and Cheves and SB lied to Tom regarding the ECM's very existence.

## II.   Totality of Defendants' Violations

Taken together, these discovery violations do not paint a very favorable picture of Defendants SB and Ruff. I find that SB has committed the following Rule 37 violations:

1.   Withheld maintenance and repair records for the truck and trailer;

2.   Failed to disclose the insurance company investigation;

3.   Intentionally withheld Ruff's complete employment file;

4.   Falsely stated that it was unaware of any disciplinary action against Ruff;

5.      Provided an incomplete answer regarding the existence of a satellite tracking system on the truck;

6.      Withheld information about the ECM unit while providing it to the consulting expert; and,

7.      Knowingly used Ruff's service logs as evidence of his final trip when it knew the logs were inaccurate.

Ruff's violations pale in comparison. However, he falsely responded to an interrogatory regarding his itinerary on the day of the accident by citing his inaccurate service logs (Doc. 47 Ex. 10 at 3), he lied about past diving citations (Doc. 47 Ex. 11; Doc. 47 Ex. 12; Doc. 47 Ex. 13), and he referenced the false answers of SB in his own answers to requests for production of repair and maintenance records (Doc. 47 Ex. 4 at 2). His actions also warrant sanction under Rule 37(c).

In considering the *Ehrenhaus* factors, I do not think that Defendants' actions warrant default judgment under Rule 37. First, Since October's metaphorical D-day, Tom has received supplemental disclosures from SB and Ruff which have not only brought the extent of Defendants' abuses to light but also provided her with the requested information. She will be able to proceed to trial with all of the information she initially requested.[7]

---

[7] In this case, the actual prejudice to Tom has been mitigated through the diligent work of her counsel. However, I acknowledge the reality under which most civil cases operate. A case can settle at any time during litigation. All litigators evaluate their cases after certain critical events: upon receiving a complete copy of the client's file; after receiving responses to written discovery; after the deposition of a party; after the disclosure of experts; and after the deposition of each expert. Sometimes parties wait until all discovery is complete before seriously engaging in settlement discussions;  more frequently, the case settles somewhere along the way. Obviously, if a party is dishonest in discovery, he deprives the other side of the ability to meaningfully evaluate the case on an ongoing basis. It is not acceptable to conclude that because withheld information is eventually produced, it is "no harm, no foul." That is why I am uncomfortable concluding an analysis of this *Ehernhaus* factor with the statement that there was little prejudice.  I think it more apt to say there was little prejudice *this time*. The case could have settled (as many do) after the first exchange of

Second, I consider the amount of interference with the judicial process. On an abstract level, it was indeed great, as Defendants and Cheves flouted the basic ethical rules of this Court, making a mockery out of the discovery process. On a more practical level, the Court has expended well over a month making sense of the allegations, conducting research, and making factual findings. I vacated all deadlines in this matter, placing the case in a holding pattern so that I might resolve the motion properly. (Doc. 73.) While a month of work is not insignificant, I note that in the realm of discovery abuse, this is indeed but a small epoch. *See Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119 (3d Cir. 2009) (discussing five years of discovery abuses which required a special master and nine days of hearings).

The culpability of the litigants is also an issue. While it is clear that SB engaged in intentionally fraudulent practices, I cannot say the same for Ruff. Furthermore, it is clear that Cheves had a large role in this deception. It would be fundamentally unfair to enter a default judgment against Ruff when SB and Cheves are responsible for most of the abuses.

The fourth factor is whether the Court warned the parties in advance of dispositive action. At no point have I put Defendants on notice of the potential for a default judgment. However, I must revisit my discussion of sanctions under Rule 37(b) versus sanctions under Rule 37(c). In asking whether SB's actions rise to the level of egregiousness necessary to warrant a dispositive sanction without a direct, prior warning from the Court, I believe the answer is yes. SB has displayed a pattern of conduct which indicates to me they have little respect for this Court. However, Ruff's conduct does not rise to that level.

---

written discovery, which did not accurately reflect the value of the case. This is why it is critical to be honest at every step in the discovery process; otherwise, if the case does settle, it is not a fair settlement. An attorney need not bend over backwards to help the other side understand the case, but he must give the other side a fair opportunity to reach the truth.

Lastly, I consider the efficacy of lesser sanctions. I believe that Rule 37 provides sufficient tools with which I may punish SB for its shameful behavior. I will consider the use of monetary sanctions and the admission of evidence below.

To be clear, SB's conduct is completely unacceptable. However, they were saved from default judgment today because Ruff, although not the model litigant, does not deserve to go down with the ship. The next time SB finds itself in court, which is likely given its line of work, I hope it remembers this Order and the sanctions which follow.

I deny Tom's motion for default judgment. Alternatively, I impose sanctions on both SB and Ruff under Rule 37(c) as follows:

1. I grant Tom's Motion to Extend Discovery (Doc. 58), and order SB to pay 50% and Cheves to pay 50% of all reasonable costs and fees associated with the additional discovery;[8]

2. I order SB to pay 100% of Tom's reasonable costs and fees associated with this motion;

3. I order SB to disclose all of the insurance investigation reports at issue in this opinion, all data collected by Ron Feder, and the ECM unit to Tom; and

4. Should this case go to trial, Tom may inform the jury, prior to introducing Ruff's disciplinary history, the post-maintenance reports, any ECM data, or the insurance company's investigative reports, that the evidence was withheld in violation of discovery rules. FED. R. CIV. P. 37(c)(1)(B); *Pers. Audio, LLC v. Apple, Inc.*, CIVIL ACTION No. 9:09CV111, 2011 U.S. Dist. LEXIS 146756, at *14 (E.D. Tex. June

---

[8] I am not imposing monetary sanctions on Ruff because I feel the other sanctions are sufficient punishment.

16, 2011) (holding that moving party may inform jury before introduction of withheld evidence of the sanctioned party's failure to disclose); *Lancelot Investors Fund, L.P. v. TSM Holdings, Ltd.*, No. 07-C-4023, 2008 U.S. Dist. LEXIS 34471, at *21 (N.D. Ill. Apr. 28, 2008) (same); *McCloud v. Goodyear Dunlop Tires N. Am., Ltd.*, No. 04-1118, 2007 U.S. Dist. LEXIS 62136, at *15-*17 (C.D. Ill. Aug. 23, 2007) (providing model jury instruction); *see also* Hofstetter v. Chase Home Fin., LLC, 2010 U.S. Dist. LEXIS 121003 at *6 (N.D. Cal. Oct. 29, 2010) (discussing informing the jury as possible sanction).[9]

## III.   Sanctions for Phillip Cheves

While Tom did not believe that Cheves should be sanctioned in conjunction with the Defendants (Doc. 76 at 1, 5), Tom was not aware of the extent of his involvement and knowledge of the violations (*see generally* Doc. 72). The facts speak for themselves. Based on a review of Tom's motion and reply, Defendants' response, and Cheves' response to the order to show cause, I find that Cheves has committed the following sanctionable acts:

1.   Certified an incomplete response to the request for maintenance records;

2.   Certified an incomplete response to request for Ruff's employment file;

3.   Certified a false answer to interrogatory about disciplinary action against Ruff;

---

[9] The Court may also provide the following jury instruction, if it so chooses:
If a party to this case has prevented the opposing party from discovering evidence you may infer that that evidence would be adverse to that party if you believe each of the following elements:

   1.   A reasonably prudent person under the same or similar circumstances would not have hid the evidence if he believed the testimony would be favorable to him; and

   2.   No reasonable excuse for the failure has been shown.

*See McCloud*, 2007 U.S. Dist. LEXIS 62136, at *17 (offering jury instruction for failing to disclose the identity of a witness to be used as a sanction under Rule 37(c)(1)(B)).

4.    Certified a false answer by SB and Ruff as to the itinerary of Ruff's trip leading up to the crash;

5.    Certified a false response as to the existence of the insurance investigation;

6.    Certified an incomplete answer regarding the availability of satellite tracking data;

7.    Misstated facts in response to Tom's motion to compel maintenance records (Doc. 35);

8.    Misstated facts in a motion for a protective order (Doc. 30);

9.    Withheld the ECM unit from Tom while providing it to a consulting expert for investigation;

10.   Lied during the October 17 hearing as to the disclosure of information to consulting experts, the availability of maintenance records, and the ability to contact Ruff regarding repair and maintenance records;

11.   Filed a response to a motion for default judgment on behalf of Defendants which denies any wrongdoing and erroneously asserts that Tom acted in "bad faith," thus reaffirming every previous misstatement before the Court; and,

12.   Filed a disingenuous response to the order to show cause which claims to have made honest mistakes rather than admit participation in Defendants' misconduct.

It is clear to me that Cheves' involvement in the certification of false discovery responses and the withholding of information, as enumerated in numbers one through nine, justify sanctions under Rule 26(g), and 37(a)(4) & (c). Cheves also violated Rule 26(g) when he signed SB's and Ruff's answers to interrogatories and requests for production, SB's motion to quash, SB's response to Tom's motion to compel, and Defendants' response to this motion for default judgment.

The facts indicate that Rule 37 and Rule 26 alone do not cover the degree of abuse

committed by Cheves. Cheves lied in his pleadings and on the record to this Court. He lied regarding his effort to find documents, the existence of records, the disclosure he gave his consulting experts, and even his ability to contact Defendant Ruff. In his response to the order to show cause, he asks me to believe that all of his failures are the result of honest mistakes; it is another lie to call his actions honest.

I find it hard to believe that Cheves would be able to hide behind Rule 11(d) to prevent him from being punished merely because he happened to lie to the Court while discovery was ongoing. However, since Cheves has continued to reaffirm these lies by arguing his actions were justifiable in the response brief for Defendants and in his own response, his misrepresentations to the Court now extend outside of discovery. *See* FED. R. CIV P. 11, advisory committee's note (1993). Thus, if Rule 11(d) offered him any protection, it has since vanished.

Even though his conduct during the life of this case has oscillated between fraudulent and indolent, I will not recommend that the Court sanction Cheves under Rule 11(c). I find that sanctions under Rule 37(c) are sufficient. Accordingly, I order Cheves to pay 50% of the reasonable costs and fees for Tom's future discovery, in addition to 100% of the reasonable costs and fees for Tom's motion to compel (Doc. 32), response brief to the motion for a protective order (Doc. 31), and preparation for and appearance at the motion hearing on October 17. Additionally, I am ethically obligated to report misconduct of an officer of the court. Accordingly, I will be referring Cheves for professional discipline with the State Bar of New Mexico.

## CONCLUSION

Like a George Seurat painting, the closer you get to this case, the messier it gets. I can honestly say that I am shocked by the extent of the discovery abuses here. For the most part, the judiciary runs on the honor system. We trust that attorneys and parties will play fair. However, while

the Court hopes and expects that all litigants and attorneys will remember their ethical duties, we are armed with tools to punish those who play dirty. While I now deny Tom's Motion for Default Judgment, I grant Tom's Motion to Extend Discovery and order that Cheves, SB, and Ruff be sanctioned in accordance with my opinion above.

       IT IS SO ORDERED.


                                         _William P. Lynch_
                                         William P. Lynch
                                         United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

32