## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

ELSIE TOM, as personal representative
of the Estate of SAM TOM,

       Plaintiff,

v.                                                                  No. Civ. 10-1257 LH/WPL

S.B. INC., an Oregon corporation, d/b/a
SHERMAN BORS HEAVY TRUCKING;
SAMUEL L. RUFF; GREAT WEST
CASUALTY COMPANY, a Nebraska corporation;
and PROTECTIVE INSURANCE COMPANY,
an Indiana corporation,

       Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant S.B. Inc d/b/a Sherman Bros Heavy Trucking's ("S.B., Inc.") Motion for Partial Summary Judgment on Punitive Damages (Doc. 109), filed June 6, 2012, and upon Plaintiff's Motion for Leave to File Addendum to Plaintiff's Response to S.B. Inc.'s Motion for Partial Summary Judgment on Punitive Damages (Doc. 145), filed July 3, 2012.   The Court, having considered the motions, briefs, evidence, arguments, relevant law, and otherwise being fully advised, finds that Plaintiff's Motion for Leave to File Addendum is unopposed[1] and will be **GRANTED,** and the supplemental exhibits will be considered in conjunction with Plaintiff's Response to S.B. Inc.'s Motion for Partial Summary Judgment on Punitive Damages, but that Defendant S.B. Inc.'s Motion for Partial

---

[1] Plaintiff filed a "Notice of Concurrence in Motion" on July 31, 2012, indicating that both counsel for Defendants have concurred in Plaintiff's Motion for Leave to File Addendum to Plaintiff's Response to S.B. Inc.'s Motion for Partial Summary Judgment on Punitive Damages.   (Doc. 198.)

Summary on Punitive Damages is not well-taken and will be **DENIED**.

## I.     FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the facts presented to this Court are as follows:

On or about March 6, 2010, at 6:53 p.m. Plaintiff's Decedent, Sam Tom ("Tom"), was turning left into the northbound lanes and across the southbound lanes of U.S. Highway 491. (Plaintiff's Complaint ("Compl."), at ¶ 10.)    At the same time, Samuel L. Ruff ("Ruff") was driving a semi-truck allegedly owned by S.B., Inc. (Def.'s Mot. For Partial Summ. J. (Doc. 109) ("S.B., Inc.'s MSJ"), at Undisputed Fact ("UF") ¶ 24.)    Ruff was not an employee of S.B., Inc. but instead was an owner/operator and was leasing to own the tractor that he was driving.[2]   (*Id*. ¶ 42.)

The tractor trailer operated by Ruff crashed into Tom's vehicle, killing Tom.    (*Id*. ¶ 25.) The posted speed limit in the safety corridor where the accident occurred was 55 miles per hour, (*Id*. ¶ 26), and according to Plaintiff's expert, Alan Asay, Ruff was traveling at approximately 56 miles per hour.    (*Id*. ¶ 27.)    There is no evidence that Ruff was using his cell phone at the time of the accident.    (*Id*. ¶ 28.)    An eyewitness, Gerald Pelt, pulled onto the interstate beside Ruff and drove alongside or near him for a couple miles before the accident, and he did not see Ruff speeding at any time.    (*Id*. ¶ 32-34.)    Indeed, he testified that he believed Ruff was traveling at the speed limit, using his signals appropriately, and not driving erratically or deviating from his lane of travel.    (*Id*. ¶¶ 35, 36.)

---

[2]  Arguing that Ruff's status as a non-employee is immaterial to S.B., Inc.'s motion, Plaintiff notes that S.B., Inc. is not relieved of its obligations under federal regulations based on such status.    (Pl.'s Resp., at 14 n.3 (referencing 49 U.S.C. § 14102).)

It is undisputed that prior to colliding with Tom's vehicle Ruff applied his brakes and swerved left.[3]   (*Id.* ¶¶ 29, 38); (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. (Doc. 144) ("Pl.'s Resp."), at 4.)   According to Thomas Mumford, an investigating officer at the accident scene, Ruff did not appear impaired or tired after the accident.   (S.B., Inc.'s MSJ, UF ¶ 40.)   In fact, the officers responding to the accident concluded that Ruff was not at fault for the accident and, rather, that the accident was caused by Tom's failure to yield to Ruff at a stop sign intersection. (*Id.* ¶ 41.)

Sometime after the accident, S.B,. Inc. determined that Ruff's logs from the day of and the day preceding the accident included inconsistencies when compared with other data from S.B., Inc.   (Pl.'s Resp., at Additional Undisputed Fact ("AUF") ¶ SS.)   First, Ruff recorded on his official log that he left Boardman, Oregon at 7:45 a.m. on Friday, March 5, 2010.   (*Id.* ¶ T.) Contrary to this logbook entry, however, Ruff was actually in the S.B., Inc. yard and office in Harrisburg, Oregon that morning at approximately 7:00 a.m. and did not load in Boardman, Oregon until 2:45 p.m. that afternoon.   (*Id.* ¶¶ Y, Z.)   Ruff also recorded in his log that he stopped for the evening at 5:30 p.m. on Friday, March 5, 2010 in Tremonton, Utah and began his

---

[3]  In response to Defendant's Undisputed Facts 29 and 38, Plaintiff concedes that Ruff applied his brakes and swerved left before colliding with Tom's vehicle, but adds "only after a delay most likely explained as due to fatigue."   (Pl.'s Resp., at 4.)   In support of this factual dispute, Plaintiff references the deposition testimony of her trucking expert, James A. Acock.   (*Id.* (citing Ex. 2, at 10:7-25).)   In the referenced deposition excerpt, Acock testified that it was his opinion that Ruff "made a slowed and bad judgment call" when he chose to steer left toward Mr. Sam Tom rather than maintain his lane.   And that choice was a cause of this accident, or crash."   (Pl.'s Resp., Ex. 2, at 10:20-23.)   Moreover, Acock opined that "Mr. Samuel L. Ruff's fatigue or sleepiness was a cause of the fatal crash."   (Pl.'s Resp., Ex. 2, at 24-25).   The Court is mindful that a Motion in Limine to Exclude Certain Testimony and Opinions of Plaintiff's Expert James A. Acock (Doc. 131) is pending before the Court, which relates to the admissibility of certain of Acock's opinions.   Arguing that they are not based on special knowledge or helpful to the jury, S.B., Inc. seeks exclusion of two relevant opinions by Acock: 1) that Ruff was fatigued, and 2) that Ruff's fatigue caused the accident.   Because the Court finds S.B., Inc.'s position persuasive, and because these opinions are not necessary for the Court's decision on the instant motion, the Court does not consider them herein.

mandatory 10-hour sleeper/rest period at 7:30 p.m. that evening. (*Id*. ¶ U.) Instead, records indicate that Ruff was actually purchasing fuel in Ontario, Oregon at 6:41 p.m. on Friday, March 5, 2010. (*Id*. ¶ AA.) Finally, Ruff logged that he commenced driving on Saturday morning, March 6, 2010, at 5:45 a.m. and made a 2-hour roadside stop somewhere in Utah between 12:00 p.m. and 2:00 p.m. that same day. (*Id*. ¶¶ V, W.) Rather, records indicate that Ruff purchased fuel in Green River, Utah at approximately 12:00 p.m. on Saturday, March 6, 2010. (*Id*. ¶ BB.) In short, Ruff drove 30 of the 35 hours before the subject accident. (*Id*. ¶ CC.) Ruff was ultimately terminated by S.B., Inc. after the accident, in part because of his hours-of-service violations and log falsifications on March 5-6, 2010.[4] (S.B., Inc.'s MSJ, UF ¶ 21); (Pl.'s Resp., AUF ¶ 4.)

On November 19, 2010, Plaintiff filed her Complaint for Wrongful Death and to Recover Damages for Personal Injury ("Complaint"), asserting that punitive damages should be awarded against Defendants as a result of the reckless conduct of Ruff and S.B., Inc. (S.B., Inc.'s MSJ, UF ¶ 1.) Initially, in response to an interrogatory request to identify factual support for her punitive damages claim against S.B., Inc. and Ruff, Plaintiff indicated as follows:

> It is believed that the acts of Samuel Ruff in operating at excessive speed, failing to slow upon approaching a congested area, failing to slow upon noting Decedent in a position of peril, changing lanes in an intersection and an area which would change the time/space calculations of Decedent, and doing the above in a safety corridor justify punitive damages. In addition, the skid marks noted in the report appeared to indicate a brake adjustment issue which would also justify such an award.

(S.B., Inc.'s MSJ, Ex. 1, at 2-3.) Then, after additional discovery, Plaintiff

---

[4] Plaintiff attempts to dispute S.B., Inc.'s Statement of Material Fact 21 with testimony from Gene Hulette, indicating that Ruff was "terminated for his whole file." (*See* Pl.'s Resp., at 4; Ex. 1, at 43:7-14.) However, Hulette's testimony does not contradict S.B., Inc.'s material fact; instead, it supports Billy Dover's testimony concerning the reasons for Ruff's termination. *Compare* (S.B., Inc.'s MSJ, Ex. 4, at 126:5-8) *with* (Pl.'s Resp., Ex. 1, at 43:7-14.)

supplemented her interrogatory this interrogatory answer to include the following:

> [S.B., Inc.] and [] Ruff willfully, wantonly and recklessly violated numerous federal
> safety rules and the defendant S.B., Inc.'s own policies.   Those safety rules include
> multiple hours of service violations and fraudulent or false log keeping and reporting.
> The defendant S.B., Inc. knew or had reason to know that the defendant Samuel Ruff was
> unqualified to drive heavy trucks on the highway, that he was dangerous in doing so.
> Samuel Ruff had a history of disregarding safety rules and bad driving.   The defendant
> S.B., Inc. knowingly, willfully, wantonly and recklessly allowed Samuel Ruff to drive on
> the fatal trip.   In addition, Samuel Ruff fraudulently produced falsified log books of his
> activities.   The defendant S.B., Inc. appears to have deliberately destroyed evidence and
> fraudulently failed to produce evidence.

(*Id.*)

There is no evidence in the record that S.B., Inc. had a history of accidents involving its drivers or owner/operators causing severe injury or death.   (S.B., Inc. MSJ, UF ¶ 7.)   Billy Dover, S.B., Inc.'s Director of Operations, testified that the company distributed newsletters to its drivers on a regular basis that included driving and safety tips.   (*Id.* ¶ 13.)   S.B., Inc. emphasized in its driver training and in its communication with drivers that if they were tired, they should pull over and stop.   (*Id.* ¶ 18.)   S.B., Inc. knew that trucking companies must make sure that their drivers are qualified to drive in order to protect the public and that unsafe drivers should not be driving for it.   (Pl.'s Resp., AUF ¶¶ A, B.)   S.B., Inc. also knew based on training that fatigue is a leading cause of fatal truck crashes and that fatigued drivers can make bad decisions and have slowed reaction times.[5]   (*Id.* ¶¶ C, D.)

In order to prevent fatigued driving and to protect the public, the Department of

---

[5] Plaintiff references testimony from various witnesses, including her trucking expert, James Acock, who testified that Ruff made a slowed, bad judgment call when he swerved left rather than maintaining his lane.   Defendant disputes Plaintiff's additional fact, arguing that "James Acock's testimony is not the equivalent of what S.B. Inc. believes with respect to its industry."   (Appendix B to S.B., Inc.'s Reply, at ¶ C.)   The Court agrees that Acock's expert opinion is not relevant to this particular additional fact, which addresses what S.B., Inc. knew about the consequences of fatigued driving.   Therefore, the Court has disregarded Acock's testimony in this instance.

Transportation established regulations governing the hours of service that commercial truck drivers can drive.   (Pl.'s Resp., Ex. 1, at 10:23-11:16; Ex. 3, at 48:26-49:8; Ex. 7, at 13:19-24.) S.B., Inc. knew that trucking companies must ensure that their drivers complied with the federal safety rules, including hours-of-service rules.   (Pl.'s Resp., Ex. 7, at 11:25-12:5; Ex. 6, at 44:10-16.)   Likewise, S.B., Inc. knew that trucking companies should have a system in place for determining whether its drivers are safe.   (Pl.'s Resp., AUF ¶ H.)

S.B., Inc. had various methods in which it could supervise and monitor drivers' compliance with hours-of-service regulations.   (*Id.* ¶ I.)   At the time of the accident, S.B., Inc. used a program called "IEG," which would scan drivers' logs and flag discrepancies.   (S.B., Inc.'s MSJ, UF ¶¶ 14, 17.)   IEG was basically a repository of issues related to a driver's performance.   (*Id.* ¶ 17.)   The drivers' logs would be processed on a monthly basis and someone at S.B., Inc. would be assigned to follow up with drivers regarding discrepancies flagged by the program, requiring additional training or disciplining of drivers if the violations were severe enough.   (*Id.* ¶ 15; Ex. 4, at 53:1-55:15.)

S.B., Inc. also had the ability to review satellite tracking information for each individual driver once per hour with its "AS/400" program, which reported the location of the truck, whether the truck was moving, and how fast.   (Pl.'s Resp., AUF ¶ I; Ex. 5, at 17:12-25.)   As a result, driver managers at S.B, Inc. could determine at any time during their workday where each of their assigned trucks was located within at least the previous hour.   (Pl.'s Resp., Ex. 5, at 18:1-8; AUF ¶ JJ.)   Using the AS/400 program, S.B., Inc. could also determine whether a driver took his or her required 10-hour break in the previous 24 hours.   (Pl.'s Resp., Ex. 6, at 56:4-57:3; AUF ¶ LL.)

Although weekday driver managers would survey satellite tracking data in the mornings looking for "shortened break(s)" during the overnight hours, (S.B., Inc.'s MSJ, Ex. 4, at 54:19-25–55:1-13), on Saturdays, S.B., Inc. employed only one rotating driver manager for all drivers, primarily to assist with fuel solution issues, general dispatch issues, and flat tires, (*Id.* ¶ 19).   This weekend driver manager did not monitor the satellite tracking system for hours of service violations. (Pl.'s Resp., Ex. 6, at 114:4-25–115:1-11; Ex. 10, at 42:4-7; 41:18-42:7; AUF ¶ NN).   Notably, the subject accident occurred on a Saturday.   (*Id.* ¶ PP.)

In an effort to help keep roads safe, S.B., Inc. also developed a point system for its drivers.   (*Id.* ¶ L.)   During orientation, drivers for S.B., Inc. were advised of the company's point system, though they did not receive technical training on it.   (*Id.* ¶ XX.)   Drivers were told that they had to meet and/or maintain certain conditions under the system, including compliance with safety guidelines regarding accidents, incidents, tickets, and violations, in order to remain qualified to drive for S.B., Inc.   (*Id.* ¶ YY.)   Drivers were also told that they would be terminated if they received eight points in three years under the system.   (*Id.* ¶ ZZ.)   The point system applied to both employee drivers of S.B., Inc. and independent contractor drivers. (*Id.* ¶ AAA.)   However, the point system was not fully implemented or enforced by S.B., Inc. (*Id.* ¶ M.)

S.B., Inc. admitted that if a driver accumulated a high number of points under the company's point system, or consistently had safety violations, it could indicate unsafe practices and the need to monitor the driver.   (*Id.* ¶ O.)   Nevertheless, S.B., Inc. did not actually have any system in place for tracking points assigned under the point system.   (*Id.* ¶ CCC.) According to Billy Dover, S.B., Inc.'s Director of Operations, no drivers for S.B., Inc. were ever

7

fired or disciplined specifically because of accumulated points under the company's point system.   (*Id*. ¶ JJJ.)

Significantly, from 2006-2010, Ruff's "Safety Jacket" included over 60 points that were assigned under S.B., Inc.'s point system, which included approximately 23 hours-of-service violations.   (*See id*. ¶ DDD; Pl.'s Resp., Ex. 7, at Deposition Ex. E.)   There is no evidence that Ruff received any discipline or warnings from S.B., Inc. regarding these hours-of-service violations.[6]   (*Id*. at Ex. 7, at Deposition Ex. E, at 4.)

With the exception of the subject trip on March 5-6, 2010, there is no direct evidence that Ruff had previously falsified his log books during the time that he drove for S.B., Inc.   (S.B., Inc.'s MSJ, at UF ¶ 10-11.)   Nor is there evidence that Ruff had ever received a citation from the Department of Transportation for log book falsification.   (*Id*. ¶ 12.)   However, according to Billy Dover, no one at S.B., Inc. ever compared satellite tracking data or dispatch records with Ruff's logs to screen for log falsifications prior to the subject accident. (Pl.'s Resp., AUF ¶ FFF.)   Indeed, during the three years that Ruff's driver manager worked at S.B., Inc. before the accident, she never compared satellite information with logbook entries and she did not know of

---

[6]  Although Plaintiff mentions in a footnote to her response brief that Gene Hullette testified that Ruff had received one or two written warnings for hours-of-service violations, she contends that Ruff's safety jacket only showed warnings for customer service issues.   (*See* Pl.'s Resp., at 15 n.4.)   S.B., Inc., on the other hand argues that "Ruff's disciplinary file clearly shows that S.B. Inc. documented and addressed some of the issues that arose during Ruff's tenure with S.B. Inc."   (S.B., Inc.'s Reply, at 7.)   Yet S.B., Inc. did not support this argument of counsel with any citation to the record; nor did it provide the Court with Ruff's disciplinary record for consideration.

Notably, the portion of Ruff's safety jacket and/or personnel file that *has* been provided to the Court does not include any indication of warnings or disciplinary action taken against Ruff.   (*See* Pl.'s Resp., Ex. 7, at Deposition Ex. E.)   Indeed, the portion of the file that enumerates Ruff's hours-of-service violations suggests the contrary – that no warnings were issued to Ruff.   (*See id.* at 4) (leaving blank the portion of the form entitled "Warning").   In sum, neither Plaintiff nor Defendant has presented admissible evidence regarding warnings or discipline given to Ruff – whether for hours-of-service violations or for customer service issues – and, instead, the admissible evidence before the Court suggests that no one was ever disciplined because of the accumulation of points under the company's point system, (*see* Pl.'s Resp., AUF ¶ JJJ).   Therefore, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that there is no evidence that Ruff received any discipline or warnings regarding his hours-of-service violations from S.B., Inc.

anyone assigned to make such a comparison.   (*Id*. ¶ GGG.)   Likewise, no one at S.B., Inc. compared Ruff's fuel purchase records with his logs before the subject accident. (*See id*. ¶ HHH.)

Although it was possible for S.B., Inc. to compare satellite tracking data and/or fuel purchase information with drivers' logs to screen for log book falsifications, it was not done as a routine procedure. (*Id*. ¶ K.)   Instead, S.B., Inc. employees Michelle Flowers and Gene Hullette would compare such data only if an accident occurred.   (*Id*. ¶ K.)   Although Jack Moody testified that the safety department would have also been assigned to compare logs to satellite tracking data for those identified as "repeat offenders," (Pl.'s Resp., Ex. 8, at 33:17-34:16), S.B., Inc. did not check Ruff's logbook violations against satellite tracking data to determine their severity or his credibility before the subject accident (*id*. ¶¶ N, FFF).

Sometime after the March 6, 2010, Ruff had brief discussions about the accident with both Gene Hullette, S.B., Inc.'s Safety and Training Manager, and Beth Young, his S.B., Inc. Driver Manager.   (Pl.'s Resp., Ex. 3, at 63:14-64:23.)   After the members of a Review Board, which included Gene Hullette and a claims representative responsible for collection and processing of insurance claims, met to discuss the accident, (Pl.'s Resp., AUF ¶ EE), the Board concluded, based on police records and witness statements, that there were no employee factors that contributed to or caused the accident.   (Pl.'s Resp., Ex. 1, at 23:17-24:9.) At the time that the Review Board met, S.B., Inc. had not yet compared Ruff's logs with dispatch records. (Pl.'s Resp., AUF ¶ GG.)   S.B., Inc. concluded during the post-accident investigation that there was nothing it needed to do to change its practices or employees' practices.   (*Id*. ¶ UU.)

While satellite tracking documentation for Ruff's March 5-6, 2010 trip was once in the

possession of S.B., Inc., the documentation has not been preserved or produced to Plaintiff in discovery.   (*See* Pl.'s Resp., Ex. 5, at 84:18-25; AUF ¶ RR.)   Beth Young and Gene Hullette both testified that sometime after the subject accident they reviewed printed screens from the AS/400 satellite tracking system, which showed the whereabouts of Ruff on March 5-6, 2010. (Pl.'s Resp., Ex. 5, at 84:18-25; Ex. 1, at 46:5-12.)   Mr. Hullette testified that the satellite tracking data confirmed that there were "inconsistencies" in Ruff's log.   (*Id.* ¶ SS.)   After an order was issued by Magistrate Judge Lynch, S.B., Inc. ultimately produced supplemental discovery responses that provided Plaintiff with documentation necessary to show Ruff's route of travel from the time of his departure on March 5, 2010, to the time of the accident on March 6, 2010, albeit not the satellite tracking data that S.B., Inc. had at one time analyzed.   (S.B., Inc.'s MSJ, UF ¶ 9.)   In his February 10, 2012 Memorandum Opinion and Order, Judge Lynch noted that Plaintiff may be permitted an adverse inference jury instruction at trial, indicating that it may be inferred that the lost satellite tracking data was adverse to S.B., Inc.   (Doc. 81, at 29 n.9.)

## II.    STANDARD OF REVIEW

An important function of summary judgment is to eliminate factually-unsupported claims.   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).   Here, S.B. Inc. is seeking summary judgment in its favor on Plaintiff's punitive damages claim.   Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).   "All facts and reasonable inferences must be construed in the light most

favorable to the nonmoving party." *Id.* (internal quotations omitted).

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    LEGAL ANALYSIS

Under New Mexico law, defendants may be liable for punitive damages under either a direct liability theory or a vicarious liability theory. UJI, 2003 NMRA 13-1827. In her Complaint, Plaintiff alleges that she is "entitled to an award of punitive damages due to the reckless conduct of Ruff and S.B. Inc." (Pl.'s Compl. ¶ 35.) According to Federal Rule of Civil Procedure 8, a plaintiff must plead facts giving rise to an award of punitive damages and requesting punitive damages as a form of relief. *See* Fed. R. Civ. P. 8. A specific pleading of the theory that supports an award of punitive damages is unnecessary, however. *See Northington v. Marin*, 102 F.3d 1564, 1569 (10th Cir. 1996) (holding that the plaintiff need not plead legal theories in the complaint as long as prejudice to the defendant does not result); *see also Chavarria v. Fleetwood Retail Corp.*, 143 P.3d 717, 725 (N.M. 2006).

Under New Mexico law, a plaintiff may be entitled to an award of punitive damages against a corporation under a direct liability theory if the corporation itself engaged in conduct

that was malicious, willful, wanton, or reckless.   *See* UJI 2003, NMRA 13-1827.   Malicious conduct is "the intentional doing of a wrongful act with knowledge that the act was wrongful." *Id*.   Willful conduct is "the intentional doing of an act with knowledge that harm may result." *Id*. Wanton conduct is "the doing of an act with utter indifference to or conscious disregard for a person's [rights] [safety]."   *Id*.   Finally, reckless conduct is "the intentional doing of an act with utter indifference to the consequences." *Id.*

Alternatively, a corporation may be held vicariously liable for punitive damages for the misconduct of its employees if:   1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages; 2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages; or 3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages.   *Chavarria*, 143 P.3d at 725.   Regardless of the theory, in assessing a wrongdoer's conduct for punitive damages purposes, the conduct must be viewed in light of the risks arising from the activity.   *Clay v. Ferrellgas, Inc*., 881 P.2d 11, 15 (N.M. Ct. App. 1994). As the risk increases, "conduct that amounts to a breach of a duty is more likely to demonstrate a culpable mental state."   *Id*. at 15.

S.B., Inc. argues in its motion that Plaintiff cannot support a punitive damages claim against it under any of the theories available under New Mexico law.[7]   Plaintiff, on the other

---

[7]  S.B., Inc. argues that much of the evidence Plaintiff has offered in support of her punitive damages claim against S.B., Inc. is irrelevant, because fatigue has not been shown to be a cause of the subject accident.   It argues, for instance, that although "Ruff may have driven over 24 hours, with minimal stops, from his departure location to the location where the accident occurred . . . , there is no evidence in this case that fatigue caused or contributed to this accident or played any part in it whatsoever."   (Def.'s MSJ, at 9.)   S.B., Inc. also notes that neither of Plaintiff's experts have any training in diagnosing or recognizing fatigue.   Curiously, these argument regarding lack of causation are made in the context of S.B., Inc.'s briefing on Plaintiff's punitive damages claim rather than in a

hand, maintains that there is evidence suggesting that S.B., Inc. is liable for punitive damages both directly and vicariously based on its ratification of Ruff's misconduct and the cumulative conduct of its employees.

## A.   DIRECT LIABILITY

First, asserting a direct liability theory of punitive damages against S.B., Inc., Plaintiff argues that there is evidence that S.B., Inc. *itself* engaged in conduct that was malicious, willful, wanton, or reckless.   (Pl.'s Resp., at 13-14.)   In this regard, Plaintiff notes that her Complaint alleges liability for S.B., Inc.'s own negligence in the events leading up to the collision, including its failure to prevent Ruff from driving given its knowledge of his hours-of-service violations, his record of other incidents, and the number of points on his record; its failure to audit log books for falsification; and its post-incident investigations.   She claims that the allegations likewise support a punitive damages award against S.B., Inc.

The committee commentary to the uniform jury instructions suggests that a direct liability punitive damages claim against a trucking company may be premised upon the company's hiring or supervision of its driver, even where the punitive damages claim against the truck driver is based upon his reckless driving.   *See* UJI 2003, NMRA 13-1827, committee commentary (providing the following example instruction for punitive damages: "If you find that the conduct of Truck Driver in his driving of the vehicle leading up to the accident was reckless or wanton, then you may award punitive damages against him. If you find that the conduct of Trucking Company in connection with its screening and hiring of Truck Driver was reckless or wanton, then

---

dispositive motion regarding causation.   The Court declines to make a ruling on causation in the context of the present motion concerning Plaintiff's punitive damages claim against S.B., Inc., particularly where there is inadequate briefing and evidence provided by the parties in this regard.

you may award punitive damages against it.)

As Plaintiff notes, S.B., Inc. had an independent duty under the Federal Motor Carrier Safety Regulations ("FMCSRs") to require its drivers, including Ruff, to observe federal motor carrier safety rules, including observance of duties and prohibitions therein. *See* 49 C.F.R. § 390.11. S.B., Inc. was also expressly prohibited by federal regulations from permitting or requiring its drivers to drive more than 11 consecutive hours following a mandatory 10 consecutive hours off duty. *See* 49 C.F. R. § 395.3. According to regulatory guidance provided by the Federal Highway Administration ("FHWA"), a division of the Department of Transportation ("DOT"), a motor carrier is liable for a driver's hours-of-service violations under the FMCSRs if "it had or should have had the means by which to detect the violations." 62 Fed. Regs. 16370-01 (Apr. 4, 1997) (answer to Question 7 regarding 49 C.F.R. § 395.3). Moreover, liability under the FMCSRs does not depend upon actual knowledge of the hours-of-service violations. *See id.* The FHA emphasized in its regulatory guidance that "[c]arriers 'permit' violations of the hours of service regulations by their employees if they fail to have in place management systems that effectively prevent such violations." 62 Fed. Regs. 16370-01 (Apr. 4, 1997) (answer to Question 8 regarding 49 C.F.R. § 395.3).

Here, it is undisputed that Ruff drove 30 of the 35 hours prior to the accident, which was a clear violation of the FMCSRs, which prohibit truck drivers from driving more than 11 consecutive hours following a mandatory 10 consecutive hours off duty. *See* 49 C.F.R. § 395.3. Plaintiff's position is that by permitting Ruff to do so S.B., Inc. engaged in willful, reckless, and wanton conduct in utter disregard of the safety of others on the road. (Pl.'s Resp., at 14.) According to Plaintiff, S.B., Inc. had "*actual* knowledge within its possession or control" of

Ruff's hours-of-service violations at the time of the subject trip; that is, S.B., Inc. had access to satellite-tracking data that would have shown that Ruff was violating hours-of-service regulations.   (Pl.'s Resp., at 14) (emphasis in original).     Plaintiff insists that S.B., Inc.'s decision to save money and to employ only one weekend driver manager, who would necessarily be unable to review satellite-tracking information for all S.B., Inc. truck drivers, does not change the fact that S.B., Inc. had access to such telling information.   (Pl.'s Resp., at 14.)   Plaintiff maintains that permitting Ruff to drive in gross violation of federal hours-of-service regulations was willful, reckless, and wanton conduct in utter disregard for the safety of others.

Moreover, Plaintiff argues that S.B., Inc.'s willful, reckless and wanton conduct is demonstrated by its "meaningless" point system, a system that S.B., Inc. claimed to have created to monitor the safety of its drivers.   During orientation drivers were advised of the point system, which applied to both employee drivers as well as independent contractor drivers like Ruff, and were told that they had to meet and/or maintain certain conductions under the system.   S.B., Inc. admitted that if a driver accumulated a high number of points under the point system it could indicate unsafe practices and the need for monitoring.   More specifically, according to S.B., Inc.'s training materials, a driver was not qualified to drive for S.B., Inc., and would be terminated, after receiving eight points in three years under the system.   Yet undisputed evidence shows that in the three years prior to the accident, Ruff accumulated over 60 points, nearly eight times the number that S.B., Inc. purportedly allowed.   As a result, Ruff was unqualified to drive and should have been terminated according to S.B., Inc. policies and procedures.   However, there is no evidence on the record that Ruff was ever disciplined or even warned about the points accumulated or the hours-of-service violations.   Instead, S.B., Inc.

15

employees testified that the company did not fully implement or enforce its point system and that it did not track the points earned by drivers.   Indeed, no S.B., Inc. drivers were ever fired or disciplined because of accumulated points under the point system.   But, again, according to the FHA, "[c]arriers 'permit' violations of the hours of service regulations by their employees if they fail to have in place management systems that effectively prevent such violations."   62 Fed. Regs. 16370-01 (Apr. 4, 1997) (answer to Question 8 regarding 49 C.F.R. § 395.3).

Additionally, under 49 C.F.R. § 395.8, S.B., Inc. had a duty to require each of its drivers to record its "duty status," including when he or she was off duty, in the sleeper berth, driving, or on-duty but not driving.   *See* § 395.8.   Making of false reports regarding duty activities would make both the driver and the motor carrier liable to prosecution. § 395.8(e).   According to regulatory guidance concerning 49 C.F.R. § 395.8, the FHA has suggested that "[a] carrier is liable both for the actions of its drivers in submitting false documents and for its own actions in accepting false documents."   62 FR 16370-01 (answer to Question 21 regarding 49 C.F.R. § 395.8).

However, S.B., Inc. readily admits that it did not routinely perform audits to determine if drivers had falsified their logbooks unless an accident occurred.   The Court agrees with Plaintiff that this type of audit program essentially invites falsification of logs.   S.B., Inc.'s failure to meaningfully audit or monitor for falsified logs or corresponding hours-of-service violations leads to a reasonable inference that S.B., Inc. was operating its trucking company in conscious indifference to its regulatory duties regarding driver hours of service.

S.B., Inc. argues that New Mexico Courts have "consistently held that a company's failure to follow safety regulations does not give rise to an inference that a defendant acted

reckless or in conscious disregard for someone's safety."   (S.B., Inc.'s MSJ, at 11) (citing *Couch v. Astec Industries, Inc*., 53 P.3d 398 (N.M. Ct. App. 2002).   In the Court's view, S.B., Inc.'s characterization of the court's holding in *Couch* is overbroad.   In *Couch*, a product liability case in which the plaintiff sought punitive damages against a manufacturer of asphalt plants and road paving equipment, the New Mexico Court of Appeals concluded that under the facts presented there the unsafe features in the defendant's asphalt plant did not give rise to an inference that the defendant acted recklessly or consciously disregarded workers' safety.   *Id*. at 411.   In reaching this conclusion, the court detailed the defendant's integrated and relatively extensive safety program and, more importantly, it noted that the defendant had offered a plausible explanation for the absence of certain safety devises and design particulars.   *See id*. at 411-12.   Ultimately, the court concluded that the evidence presented by the plaintiff did not suggest that the defendant had been cavalier about the plant's safety or simply disregarded applicable safety features.   *Id*.   The court did *not* hold that as a general matter a company's failure to follow safety regulations does not give rise to an inference that the defendant acted recklessly.   Indeed, the court referenced *Clay v. Ferrellgas* and provided a parenthetical explaining that, there, the defendant's negligent installation of a propane conversion system in a car "together with its consistent violation of safety regulations, amounted to corporate indifference and reckless conduct."   *Id*. at 411.

Here, unlike in *Couch*, Plaintiff has presented evidence that could give rise to an inference that S.B., Inc. had a cavalier attitude about compliance with federal hours-of-service regulations.   Specifically, the evidence shows that S.B., Inc. took little to no action when Ruff accumulated over 60 points in three years under the company's point system, primarily for

hours-of-service violations, and that it failed to otherwise properly implement safety practices or meaningfully supervise its drivers.

In the Court's view, Plaintiff has created a genuine issue of material fact as to the culpable mental state of S.B., Inc. under a direct liability theory.   Viewing the evidence in Plaintiff's favor, she has demonstrated that S.B., Inc., had in its possession at the time of the accident, through its satellite-tracking program, information that Ruff was flagrantly violating federal hours-of-service regulations, albeit undiscovered by the lone weekend driver manager. Additionally, evidence suggests that S.B., Inc. failed to enforce the system that it created to monitor the safety of its drivers and the motoring public, allowing Ruff to accumulate over 60 points, which included 23 hours-of-service violations, in the three years preceding the subject accident, without disciplining or warning him.   Finally, evidence suggests that S.B., Inc. did not audit drivers' log books, cross-referencing other data, to screen for falsifications unless an accident occurred.   Accordingly, the Court determines that a reasonable jury could conclude that such conduct by S.B., Inc. justifies the imposition of punitive damages under a direct liability theory.

This conclusion is buttressed by a review of persuasive authority from other district courts facing similar fact patterns.   For example, in *Trotter v. B & W Cartage Co., Inc*., No. 05cv205 MJR, 2006 U.S. Dist. LEXIS 19074 (S.D. Ill. Apr. 13, 2006), the Southern District of Illinois determined that a reasonable jury could find the imposition of damages for "aggravating circumstances" was warranted against the trucking company there.   *Id*. at *20.   The standard for "aggravating circumstances," which the court considered because punitive damages were not permitted under Missouri's Wrongful Death Act, was virtually the same as New Mexico's

18

standard for punitive damages, requiring proof of "willful misconduct, wantonness, recklessness, or want of care indicative of indifference to consequences." *Id.* at *5-6.   The court's determination that damages for "aggravating circumstances" should be considered by the jury was based upon evidence that the truck driver was driving well outside of the federally-regulated hours of service at the time of the subject accident, that he was operating his truck in a manner consistent with a person driving in a state of extreme fatigue, that he had submitted falsified driving logs in the weeks preceding the accident, and that the company's system of preventing hours of service violations was inadequate. *Id.* at *13-15.   The trucking company's safety director testified that the company performed "inadequate" computerized scanning of driver logs and that he also conducted "random 'hard audits'" of driving logs in which logs were compared with supporting documentation to determine compliance with hours of service regulations. *Id.* at *16.   The court determined that there was a reasonable inference to be drawn that the trucking company operated for a substantial period of time "in conscious indifference to its duties under the FMCSRs governing driver hours of service." *Id.* at *17-18.

Attempting to distinguish *Trotter*, S.B., Inc. emphasizes that certain evidence present there is absent here.   For instance, in *Trotter* there was evidence that the truck driver was operating his truck "in a manner consistent with that of a person driving in a state of extreme fatigue, and that, in the weeks preceding [the decedent's] death, [the driver] repeatedly submitted fake logs of his driving hours to [the trucking company]."   (S.B., Inc.'s Reply, at 5) (citing *Trotter*, at *13.)   Here, there is evidence that Ruff was driving the speed limit, using his signals appropriately, and not deviating from his lane of travel.   However, while there is no direct evidence that, at the time of the accident, Ruff was driving his truck in an erratic manner that

would suggest extreme fatigue, an inference could nonetheless be made by a jury that Ruff's nearly 30 hours of consecutive driving caused a lack of alertness that may have contributed to the subject accident.   Moreover, while there is no direct evidence that Ruff falsified his logs in the time period preceding the subject accident, a jury could attribute this lack of evidence to a sub-standard method of verifying and/or auditing driver logs by S.B., Inc.

In *Came v. Micou Transport Co.*, No. 04 cv1207, 2005 U.S. Dist. LEXIS 40037, (M.D. Penn. 2005), the Middle District of Pennsylvania denied a motion for partial summary judgment as to a claim for punitive damages against a trucking company, where evidence showed that the company's driver was in violation of federal hours-of-service regulations, that he was operating his vehicle in a state of fatigue, and that he falsified his logs to avoid detection.   *Id*. at *15. Allowing the punitive damages claim against the trucking company to survive summary judgment, the court reasoned that the trucking company should have been aware of the driver's regulatory violations but failed to employ an effective procedure to monitor hours-of-service violations.   The court reasoned as follows:

> A reasonable jury . . . could find that:   failure to monitor [the driver's] conduct; failure to make an adequate and proper investigation and inquiry into [the driver's] driving and employment record; . . . and [the] failure to have effective procedures in place to verify drivers' hours of service when [the trucking company] knew that hours of service regulations were in place to protect the safety of the monitoring [sic] public, constitute[d] 'reckless indifference to the rights of others' and accordingly warrant[ed] the imposition of punitive damages against [the trucking company].

*Id*. at *16.

S.B., Inc. notes that in *Came*, the plaintiff presented expert liability reports prepared by the SALT Institute as well as by Dr. Gerald P. Krueger, a sleep specialist, and argues that Plaintiff's evidence here lacks equivalent expert opinions.   For instance, the experts in *Came*

offered expert testimony that the truck driver was fatigued and fell into a microsleep just prior to the collision, that the company failed to have an effective procedure in place to verify drivers' hours of service, and that it had a faulty log auditing system.   While the Court acknowledges that the plaintiff in *Came* may have provided more comprehensive expert testimony to support his negligence claims against the trucking company, it is not persuaded that the combination of expert and lay testimony provided here would leave a reasonable jury unable to award punitive damages against S.B., Inc.

Finally, in *Wang v. Marziani*, 885 F. Supp. 74 (S.D.N.Y. 1995), the Southern District of New York concluded that a genuine issue of material fact existed, precluding summary judgment in favor of a truck driver, where the driver logged hours in excess of federal regulations, falsified his duty log, and failed to secure his cargo.   *Id.* at 79.   The court likewise concluded that the trucking company there was not entitled to summary judgment on the punitive damages claim against it, where there was evidence that the company failed to monitor the truck driver's conduct and essentially encouraged him to exceed federally-proscribed driving time limits.   *Id.*

In addition to the evidence presented regarding the failures of S.B., Inc. to monitor and prohibit hours-of-service violations and log book falsifications, Plaintiff also argues that certain discovery abuses by S.B., Inc. in the present litigation would allow a jury to infer a culpable mental state by S.B., Inc.   These discovery abuses are outlined by the Court in Judge Lynch's February 10, 2012 Memorandum Opinion and Order.   (*See* Doc. 81.)   As a sanction for various discovery abuses, Judge Lynch ruled that Plaintiff may inform the jury at trial, prior to introducing Ruff's disciplinary history, post-maintenance reports, ECM data, and the insurance company's investigative report, that the evidence was initially withheld in violation of discovery

rules.   (Doc. 81, p. 29.)   Additionally, Judge Lynch suggested that the Court may provide an adverse inference instruction at trial regarding the satellite tracking data that S.B., Inc. once had in its possession but has not preserved or produced in discovery.     (Doc. 81, p. 29 n.9.)

Plaintiff now attempts to rely upon these sanctions and suggested instruction as evidence of S.B., Inc.'s culpable mental state.   Plaintiff's principal argument in this regard is that Judge Black, in *Ration v. Stallion Transport., Inc.*, 03cv110 BB/ACT (D.N.M. Feb. 3, 2004), held that an adverse inference instruction, which resulted from the spoliation of evidence, created a fact issue sufficient to defeat summary judgment as to punitive damages.   (Pl.'s Resp., at 17.)   The Court disagrees, however, that Judge Black's analysis in *Ration* provides support for the general proposition that discovery abuses may be considered as evidence of a defendant's culpable mental state.   In *Ration*, Judge Black did not, in fact, consider the defendant's discovery abuses as evidence of culpable mental state; instead, he noted that the trucking company's spoliation of evidence of the driver's daily log and personnel file would presumably allow a jury to infer,[8] based on an adverse inference instruction, that the truck driver "habitually violated the hours-of-service limitations set by federal regulation, and that Stallion knew this."   *Id.* at 3-4. With such an inference at play, Judge Black ultimately determined that there was sufficient evidence for the plaintiffs' punitive damages claim against the trucking company to survive summary judgment.   *Id.* at 7.

In contrast, here, if the Court were to instruct the jury as Judge Lynch has suggested -- that it could infer that the unpreserved satellite tracking data would be adverse to S.B., Inc. -- it

---

[8] Judge Black assumed without decide for purposes of the defendant's motion for partial summary judgment as to punitive damages that sanctions similar to those recommended by the Magistrate Judge would be imposed.   *Ration*, 03cv110 BB/ACT, at 6.

would simply lead to the conclusion that Ruff flagrantly violated the hours-of-service regulations and that S.B., Inc. had such information in its possession.   But such conclusions are already undisputed.   Moreover, the Court is not inclined to consider discovery conduct, which has no relation to the subject accident or to Plaintiff's causes of action, as relevant evidence of S.B., Inc.'s mental state for purposes of punitive damages. *See* UJI 13-1827 (indicating that "the amount awarded, if any, [as punitive damages] must be reasonably related to the injury and to any damages given as compensation").   Perhaps most importantly, the Court finds that there is adequate evidence absent these discovery abuses or the suggested adverse inference instruction for Plaintiff's punitive damages claim against S.B., Inc. to survive summary judgment.

### B.   VICARIOUS LIABILITY

Given the undisputed evidence that Ruff violated federal hours-of-service regulations, both at the time of the accident and at times before the accident, and that he falsified his log book on the day of the accident, a reasonable jury could find that Ruff acted deliberately, with utter indifference to the consequences of his actions, and therefore acted recklessly.  S*ee Wang v. Marziani*, 885 F. Supp. 74, 79 (S.D.N.Y. 1995) (concluding that a reasonable jury could conclude that violating federal hours-of-service regulations, falsifying logbooks, and failing to secure all cargo constitute "reckless indifference to the rights of others").   The Court must consider, then, whether S.B., Inc. might also be liable for punitive damages under a vicarious liability theory.

S.B., Inc. argues that it cannot be vicariously liable for Ruff's actions, because Ruff was not its employee, but was instead leasing the truck involved in the subject accident under an owner/operator, or independent contractor, arrangement.   The Court disagrees, finding that

evidence exists to suggest that S.B., Inc. exercised sufficient control over Ruff's driving to render summary judgment on Plaintiff's vicarious liability claims improper.  *See Thomas v. Johnson Agri-Trucking*, 802 F. Supp. 2d 1242 (D. Kan. 2011) (holding that, although the truck driver claimed to be an independent contractor for the trucking company, there was evidence to suggest that the trucking company had control over the driver, such as the requirement that the driver turn in his logs, and was therefore vicariously liable for his conduct); *Phillips v. Dallas Carrier Corp.*, 416 F. Supp. 766 (M.D.N.C. 1991) (concluding that a truck driver who operated a tractor-trailer owned by the defendant trucking company was an agent of the company because the trucking company exercised control, supervision, and authority over the driver's services, and because the Interstate Commerce Commission regulations virtually eliminate the independent contract concept and cast upon trucking companies the full responsibility for the negligence of drivers).

### i.   Ratification

A corporation may be liable for punitive damages for the misconduct of one of its agents if the corporation in some way authorizes, ratifies, or participates in the conduct.  *See Chavarria*, 143 P.3d at 727 (adopting Restatement (Second) of Agency, § 217C and Restatement (Second) of Torts § 909).   Plaintiff argues that S.B., Inc. ratified Ruff's conduct in several ways 1) by choosing not to act when it knew, or should have known, of Ruff's hours-of-service violations, both before and on the date of the subject accident; and 2) by exonerating Ruff's conduct in its post-accident investigation.

Again, Judge Black determined in *Ration*, based largely upon the adverse inference discussed herein, that a reasonable jury could conclude that the driver regularly violated the

24

federal driving-limit regulations but that the trucking company did nothing to correct the behavior.    *Id.* at 3-4.    Reasoning that a reasonable jury could find that the trucking company ratified or participated in the driver's reckless conduct, Judge Black denied the defendants' motion for partial summary judgment as to punitive damages.    *Id.*

Here, the evidence that Ruff regularly violated the federal hours-of-service regulations and that S.B., Inc. did nothing to correct such violations is more direct than in *Ration*.    Ruff's safety jacket suggests that he accumulated over 60 points under the company's points system, primarily for hours-of-service violations, in the three years preceding the subject accident.    Yet the available evidence also suggests that S.B., Inc. allowed Ruff to continue driving without disciplining him, scrutinizing his logs, or even comparing the logs with other data, such as satellite tracking data or dispatch data.    Consequently, a reasonable jury could find here, like in *Ration*, that S.B., Inc. ratified or participated in Ruff's reckless conduct.

Secondly, Plaintiff argues that S.B., Inc. ratified Ruff's conduct through its post-accident investigation.    According to Plaintiff, S.B., Inc.'s "exoneration of Ruff for his conduct of driving in excess of hours and falsifying his logs" was an act of ratification of his conduct. (Pl.'s Resp., at 20-21.)    Notably, a court may consider post-subject-incident events in evaluating whether a defendant's conduct warrants punitive damages.    *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1249 (10th Cir. 2000) (determining that evidence of the defendant's culpable mental state may include conduct that occurred after the incident in question).

Here, members of a Review Board, which included Gene Hullette, S.B., Inc.'s Safety and Training Manager, and a claims representative responsible for collection and processing of insurance claims, concluded, based on police records and witness statements, that there were no

employee factors that contributed to or caused the accident and that there was nothing that S.B., Inc. needed to do to change its practices or employees practices.   Significantly, though, at the time the Board met, S.B., Inc. had not yet compared Ruff's logs with dispatch records.   Without evidence that S.B., Inc. knew at the time of the Review Board meeting that Ruff had violated federal hours-of-service regulations and falsified his logs, the board's conclusion itself does not strongly suggest ratification.   On the other hand, the fact that the Board apparently issued its conclusions without scrutinizing Ruff's logs or hours-of-service does suggests some degree of passive ratification of Ruff's actions.   S.B., Inc. notes that it terminated Ruff after the accident in part because of his log falsifications on March 5-6, 2010, and suggests that this is evidence that it did not ratify Ruff's conduct in exceeding the driving hours proscribed by federal regulations.   Ultimately, the Court concludes that evidence that S.B., Inc. chose not to act when it knew or should have known of Ruff's hours-of-service violations, together with evidence that it failed to scrutinize Ruff's hours of service or logs before issuing conclusions at the post-accident investigation, constitutes sufficient evidence of ratification of Ruff's conduct for Plaintiff's punitive damages claim against S.B., Inc. to withstand summary judgment on the theory of ratification.

### ii.   Cumulative Conduct

Finally, although not yet incorporated into New Mexico's punitive damages uniform jury instruction, the New Mexico Court of Appeals has determined that the "cumulative conduct" theory discussed in *Clay v. Ferrellgas* provides another avenue for obtaining punitive damages against a corporate defendant, in addition to the "Direct Liability" and "Vicarious Liability" avenues outlined in Uniform Jury Instruction 13-1827.   *Grassie v. Roswell Hosp. Corp*., 258

P.3d 1075, 1084 (N.M. Ct. App. 2010).   This alternative theory provides that an award of punitive damages against a corporation may be based on "the actions of the employees [viewed] in the aggregate [in order] to determine whether [the employer corporation] had the requisite culpable mental state because of the cumulative conduct of the employees."   *Id.* at 1084 (citing *Clay*, 881 P.2d at 15); *see also Flowers v. Lea Power Partners, LLC*, No. 09cv569 JAP/SMV, at *4 n.5 (D.N.M. Apr. 17, 2012) (acknowledging that when a corporate defendant is involved, it may be subject to punitive damages if it is culpable itself . . . but also when its employees' behavior in the aggregate amounts to reckless or culpable behavior, even if the employees are not managerial).   In *Chavarria,* the New Mexico Supreme Court treated the "cumulative conduct" theory of punitive damages as a third type of vicarious liability.   *Chavarria*, 143 P.3d 717.

Plaintiff argues that the cumulative conduct of many different employees within S.B., Inc. demonstrates a culpable corporate mental state.   For the most part, the employee "conduct" enumerated by Plaintiff can be characterized as "inaction."   Plaintiff complains, for example, that S.B., Inc. employees:

> failed to completely implement and make operational the company's point system; failed to review drivers' points once the points were obtained; failed to warn or otherwise discipline Ruff and others once points were obtained; decided that, as a matter of procedure, satellite tracking information and gas receipts would not be cross-referenced with log books to check for falsification; decided that dispatch should not check satellite tracking information on Saturdays; decided that a dispatcher would not communicate with drivers on weekends and order them to pull over if they drove in excess of hours of service limits; decided that, although Ruff had driven for 30 of the 34 hours prior to the fatal collision and falsified his log books, that fatigue was not a factor in the accident and neither Ruff nor [S.B., Inc.] could have done anything different to have prevented the accident.   (Pl.'s Resp., at 22.)

S.B., Inc. omits discussion of the cumulative conduct theory or its application to the facts

27

presented here.    Plaintiff, on the other hand, has presented evidence creating a genuine issue of material fact as to whether the cumulative conduct of S.B., Inc. employees amounts to corporate recklessness.    It will therefore be up to a jury to determine whether the cumulative conduct of S.B., Inc. amounts to corporate recklessness justifying a punitive damages award.

In sum, under the facts presented to the Court viewed in the light most favorable to Plaintiff, there is a question of material fact as to whether S.B., Inc. is vicariously liable, either through the authorization or ratification of Ruff's conduct or through the cumulative conduct of its employees, for punitive damages.

## IV.   CONCLUSION

For all of these reasons, the Court finds that partial summary judgment in favor of Defendant is not warranted on Plaintiff's punitive damages claim.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Leave to File Addendum to Plaintiff's Response to S.B. Inc.'s Motion for Partial Summary Judgment on Punitive Damages (Doc. 145) is hereby **GRANTED** and that Defendant's Motion for Partial Summary Judgment on Punitive Damages (Doc. 109) is hereby **DENIED**.

_____

SENIOR UNITED STATES DISTRICT JUDGE